SAMUEBS, J.
I am of opinion, that the statute, Code, ch. 58, l 4, construed according to the statute, Code, ch. 16, (S 17, rule third, gave authority to a majority of the seven directors to form a board for the election of a president.
I am further of opinion, that if a majority be present and qualified to vote and do vote, the election may be made by a majority of the votes given, although they be not a majority of the whole board; and this although others of the directors be present, but do not vote.
I am further of opinion, that inasmuch as on the 18th of May 1853, John W. Young received the votes of three directors, and Samuel D. Booker the votes of two directors, there having been but five votes given, John W. Young might then have been duly declared to be elected president, if nothing more appeared in the record. Yet as it is shown that he did not then accept the office, or enter upon its duties, but left Booker to discharge those duties, and that the election was adjourned to another day, it should be held that no election was made on that day.
I am further of opinion, that the board of directors have authority to decide when they will go into an election, or having commenced it, to decide whether they will proceed with it, or to adjourn it to another day.
*1 am further of opinion, that the statute, Code, ch. 57, $ 16, withholding the right of voting in case of personal interest, applies to the election of president. The obvious purpose of the statute was to prevent directors, mere trustees, from voting in such cases, lest their individual, personal interests might be promoted at the expense of the cestuis que trust, the stockholders. This construction is in strict conformity with the general principles of law governing the relations of principal and agent, and cestui que trust and trustee.
Thus I am further of opinion, that in the election of June 22d, 1853, the vote of John W. Young to put himself in office, and the vote of Samuel D. Booker the then incumbent, in effect to keep himself in office, were both given without warrant of law, and should not be counted; thus leaving but five votes, of which Young received three and Booker two, and that thus Young at that time was duly elected president.
I am of opinion to affirm the judgment.
DANIEB, J. The proceeding by way of mandamus seems to me to be a fair, convenient and ready mode of litigating and deciding upon questions such as those presented by the record of this case. The propriety of resorting to it in cases of the like kind is, I think, fully sanctioned in Smith v. Dyer, 1 Call 562, and in Dew v. *595 The Judges of the Sweet Springs, 3 Hen. & Munf. 1. I am not aware that the authority of these precedents has been questioned in any subsequent decision of this court; and they furnish, in my opinion, a satisfactory answer to the objections made here to the remedy selected by the petitioner.
It becomes necessary therefore for us to consider the case on its merits. In doing so, the first question which we have to decide (and indeed the only one which needs be considered if answered in the negative) is, has Booker any right to the office?
When the new board of directors assembled on the ^lSth of May 1853, Booker held the office of president by virtue of a previous appointment; and by the provisions of the 4th section of ch. 48 of the Code, he had a right to enjoin the office until his successor was appointed.
If such successor has been appointed, Booker’s right to hold office any longer is determined, and he has no claim to be restored, even though it should be made to appear that Young has now no valid title to the office.
It is stated in the return, that on the 18th of May 18S3 three votes were taken, all of the directors being present. On the first, six votes were cast, Booker receiving two, Young three, and Scott one. On the second and third votes, only five directors voted, and on each occasion Young received three and Booker two votes, Young and Booker each failing to vote.
Was not Young duly elected on the second casting of votes? In Wilcock on Corporations, § 546, it is said that after an election has been properly proposed, whoever has a majority of those who vote, the assembly being sufficient, is elected, although a majority of the entire assembly altogether abstain from voting, because their presence suffices to constitute the elective body, and if they neglect to vote, it is their own fault, and shall not invalidate the act of the others, but be construed an assent to the determination of the majority of those who do vote; and such an election is valid, although the majorit3r of those whose presence is necessary protest against any election at that time, or even the election of the individual who has the majority of votes: the only manner in which they can effectually prevent his election is by voting for some other qualified person. This section is adopted in Angelí & Ames on Corporations, and forms the 126th section of the treatise. See also Oldknow v. Wainwright, 1 Wm. Black. R. 229; S. C. 2 Burr. R. 1017.
*It is nowhere alleged or suggested that the assembly of the 18th May was not held regularly, or that the election was not “properly proposed.” The whole body, of electors was present; and Young received a majority of those who chose to vote. Was he not, on the force of the authorities just cited, then elected? And if so, was not Booker’s successor then appointed?
No further act is required to be done in order to complete the title to the office; nor indeed does the law prescribe any admission or form of induction into office to be observed in order to perfect the right to its possession. ,
The third section of the 48th chapter of the Code provides that no director of a bank or branch shall act as such without first taking the oath therein prescribed. But no additional oath is required of the president, as such.
When it was ascertained, therefore, that Young had received a majority of the votes cast, the right to the office was ipso facto conferred upon him; and consequently Booker’s right to it was determined and gone. The fact that the assembly, after the vote was announced, proceeded to order an adjournment over of the election, as if no election had been made, could not have the effect of restoring Booker’s right to the office. Nor is this proposition at all affected by the consideration that Young acquiesced in the adjournment, or by the further consideration that Booker still continued, to act as president, without any challenge of, or protest against, his right to do so. This course was no doubt pursued by all the parties under a belief that no valid election had taken place; but all the facts on which the rights of the parties depended were fully known. There is no suggestion that the assembly did not go into the election with the intention to be governed by its legal result; and if that result was to transfer the right to the office from Booker to ’‘"Young, no subsequent action of the assembly could annul or destroy it. Young, it is true, had a right to accept or reject the office. Whether the adjournment over of the election with his assent, and the subsequent holding of the office by Booker, might not be construed into an implied refusal by Young to claim or accept the office by virtue of the proceedings of the 18th May, is, however, a question, the answer to which cannot affect Booker. The relinquishment of the office, however formal, by Young, could not invalidate the election; and of course could not reinvest Booker.
The casting of the votes, as soon as completed and announced, became an irrevocable act. The choice was then made and declared; and the appointment conferred by the appointing power, whose function pro hac vice was thereupon discharged and ended. There was nothing inchoate, or incomplete in the transaction.
Young’s title to the office, and right to enter upon it, was perfect, and of course Booker’s right to hold over no longer had any existence. His old title was determined, and the resolution or order of the board adjourning over the election could not, by implication, confer on him a new title to the office. And any election thereafter held to elect a president would, in legal contemplation and intendment, be, not an election to appoint a successor to Booker, but an election to fill the vacancy occasioned by Young’s resignation, or refusal to accept. Marbury v. Madison, Ch. Jus. Marshall’s *596 Opinion, 1 Cranch’s R. 137; Bank of Va. v. Robinson, 5 Gratt. 174.
The objection to this view, founded on the third rule prescribed for the construction of statutes, in the 17th section of ch. 16, tit. 8 of the Code, is, I think, untenable. That rule declares that words purporting- to . give authority to three'or more public offi"cers or other persons, shall be construed as giving such authority to a majority of such officers or other persons, ^unless it shall be otherwise expressly declared in the law giving the authority. It is argued that this rule applies here; and that, under it, Young could not rightfully have claimed to be elected by the proceedings of the 18th of May 18S3, as he did not, on a.ny one casting of the votes, receive a majority of the votes of the whole body of directors. This is to give to the rule an application and effect which a fair construction of its language does not in my opinion justify. No attempt was made, by any number of the directors less than a majority of the whole, to make an election.
Conceding, for the sake of t'he argument, that as Young and Booker declined to vote, they should not be counted as part of the assembly, still the two directors who voted for Booker were as much engaged in the exercise of the authority given to the directors as the three who voted for Young. And Young’s election, in this state of things, would be the result not merely of the action of the three directors who voted for him, but of the action of the five, in holding the assembly, going into the election, casting, counting, announcing and recording the vote. In all these things the five directors equally participated, and in this aspect of the case the election was made, the authority conferred on the body of the directors was exercised by five, and not by three directors.
But in fact Booker and Young were present, and, by force of the authority which I have cited, must be regarded as assenting to the determination of the majority of those who voted: And thus, though we should yield to the construction of the rule contended for by the counsel of Booker, and hold that in order to make a valid election four directors must unite in the specific purpose of electing a particular nominee, the requirements of the rule would be virtually and substantially'fulfilled, and Young would be regarded *as the choice of five. And if it be said that in this view of the case Young would be assenting to his own election, it would still be unnecessary to go into the consideration of his right to vote for himself, inasmuch as, after discarding his assent, there would be still four, a majority of the seven directors, assenting to his election.
From the best consideration I have been able to give to the subject, it seems to me that Young was duly elected on the second casting of votes on the 18th of May; and that Booker’s right to hold over was thereby determined. Booker’s right to the office being thus negatived, it becomes unnecessary to look into the present state of Young’s title. Without considering, therefore, whether or not Young has lost or abandoned his title to the office as founded on the election of the 18th of May, and if so, whether or not he was afterwards legally elected on the 22d of June 1853, I am for affirming the judgment, on the ground that Booker, at the date of the institution of this proceeding, had no right or title to the office.
BEE, J., concurred in the opinion of Daniel, J.
MONCURE, J., concurred in the results; but did not concur entirely with Daniel or Samuels, Js. He thought that the first election not having been insisted on, was no election. But he thought that Young might vote for himself, and that therefore the second election was valid.
Judgment affirmed.