## CHARLESTON.

Submitted June 19, 1893.—Decided November 15, 1893.

STATE *ex rel.* THOMPSON *et al.* v. MCALLISTER, MAYOR, *et al.*

1 CONSTITUTIONAL LAW—MUNICIPAL CORPORATIONS—OFFICERS.
 Section 13 of chapter 47 of the Code, which requires members of municipal councils to be freeholders therein, is constitutional and valid. (pp. 488, 497, 499.)

2. CERTIORARI—PRACTICE—MUNICIPAL CORPORATIONS.

*Certiorari* and not *mandamus*, is the proper remedy to review the proceedings of a municipal council, under section 23 of chapter 47 of the Code.   (pp. 496, 516.)

BROWN, JACKSON & KNIGHT, for plaintiff in error cited 29 Ohio St. 1183; 8 Col. 420; Mich. Pub. Of. § 96; 50 Wis. 103; 15 Cal. 117; 25 Cal. 93; 3 Nev. 566; 3 Minn. 240; 23 Neb. 385; Merr. Man. § 235; *Id.* 232; High. Ex. Leg. Rem. § 439; 7 Leigh. 689; 43 La. An. 92; Merr. Man. §§ 10–51; High Ex. Leg. Rem. § 16; Hutch. W. Va. Trea. § 1272; 77 Va. 415; Code, c. 110, s. 2, 3, 4.

C. R. LEWIS and BOWYER & GREEN for defendant in error cited 3 H. & M. 1; 2 Ld. Raym. 1008; High Ex. Rem. § 483; 6 W. Va. 562; *Swinburn* v. *Dryden*, 20 W. Va. 89; 34 W. Va. 742; 35 W. Va. 174; Hutchinson's W. Va. Practice, § 1278; 3 H. & M. 1; 12 Gratt. 396; 77 Va. 415; 89 N. C. 125.

DENT, JUDGE:

The following is the statement of facts taken from the brief of the counsel for the defendants in error, to wit:

"On the 5th day of January, in the year 1893, at an election in the town of Hurricane, Putnam county, W. Va., a town incorporated under chapter 47 of the Code, for municipal officers of said town, John M. Thompson and C. A. Smith, residents of said town, and entitled to vote for members of its common council, together with G. W. Dudding, J. P. Mynes, and M. L. Dunfee, were elected to office of councilmen of said town for the year commencing on the 1st day of February, 1893; the number of councilmen for said town being five, the town not being laid off into wards.

"On the 16th day of January, 1893, at a meeting of the outgoing council, the returns of said election were canvassed, and it was declared that the above five persons received the largest number of votes at said election for the office of councilmen of said town; and said council, at this meeting, further decided, among other things, that said Thompson and Smith were not duly elected officers of said town, because they were not freeholders therein, and

further declared that W. L. Losee and W. S. Turley, two members of the old council, but not elected to the new council, should hold over as councilmen until their successors were qualified—the said Smith, at that time, and at the time of said election, being in possession of a lot of land in said town, which he owned by a title-bond, and said Thompson's wife, at said dates, owning in fee land in said town. On the 17th day of January, 1893, the said Smith and J. M. Thompson each bought land in said town, which was conveyed to them, respectively, by deeds dated, respectively, on the 17th and 18th of January, 1893.

"On the 20th day of January, 1893, the said Thompson and Smith each duly took the oath of office as councilmen of said town, and duly filed the same with the recorder, or acting recorder. At the first meeting of the new council, said Turley and Losee being present and acting, on the 6th day of February, 1893, the said Thompson and Smith presented themselves, and demanded that they be admitted to the office of councilmen, and permitted to perform their duties as such, but they were refused and denied admittance to their office. On the 11th day of February, 1893, the said Smith and Thompson obtained from the judge of the Circuit Court of Putnam county a *mandamus nisi* to Wm. H. McAllister, mayor; R. V. Dorsey, claiming to be and acting as recorder; G. W. Dudding, J. H. Mynes, and M. L. Dunfee, councilmen; and W. L. Losse and W. S. Turley, claiming to be and acting as councilmen of said town—commanding the first five to admit said Thompson and Smith into the office of councilmen of said town, and commanding said Losee and Turley to surrender and turn over to said Thompson and Smith the office of councilmen of said town. The defendants Dudding and Mynes made return to said *mandamus nisi* that they were willing, and had always been, to admit said plaintiffs to the office of councilmen, and had made and seconded a motion to admit them, but that the majority, including said Losee and Turley, had voted against the motion. The defendants McAllister, Dorsey, Dunfee, Losee, and Turley moved to quash the writ of *mandamus nisi,* which motion the Court overruled; and, the said defendants not desiring to make return to said writ,

the court gave judgment for a peremptory writ of *mandamus* to issue, from which judgment the last five of defendants have obtained this writ of error and *supersedeas*."

Appellants assign three grounds of error in their petition for writ of error, viz : First, it was error in the Circuit Court to hold the statute, which requires councilmen to be freeholders, unconstitutional; second, the Circuit Court should have sustained the motion to quash the alternative writ of *mandamus* because, among other defects upon the face thereof, the plaintiffs claiming several rights could not obtain a joint writ of *mandamus;* third, said motion to quash should also have been sustained because the alternative writ of *mandamus* failed to make a case for the plaintiffs, or either of them, to obtain the relief prayed for.

In my opinion there are only two questions suggested by the facts in this case as proper, at the present time, for the consideration of this Court: (1) Is the law containing the free-hold requirement constitutional ? (2) If so, have the relators mistaken their remedy as to all other questions raised by them?

1. In determining this constitutional question, we find the rule plainly laid down in the case of *State* v. *Dent*, 25 W. Va. 19, in these words, to wit: "Article 6, § 1, of our constitution provides : 'The legislative power shall be vested in a senate and a house of delegates.' This obviously confers on them all legislative power, except such as they are prohibited by the constitution in other provisions from exercising." And the person claiming that an act of the legislature is an infringement of the restrictions of the constitution must point out the provision plainly forbidding, either by express words or by inevitable implication, the passage of such act; and, if none such exists, the act, however unjust or unreasonable it may seem, is valid, and must be sustained by this Court. Judge Cooley, as quoted approvingly in the above case, lays down the rule that "any legislative act which does not encroach upon the powers apportioned to other departments of the government, being *prima facie* valid, must be enforced unless restrictions upon the legislative authority can be pointed out in the constitution, and the case shown to come within them."

The defendants in error recognizing the binding force of this rule point out three sections of the constitution, all and each of which, they claim, are violated by the act in question:

First. Section 4, art. IV, which provides that "No person except a citizen entitled to vote shall be elected or appointed to any office, state, county or municipal." Defendants in error agree that because this section forbids any persons except qualified electors to hold office, by just implication, the converse of the proposition is also included in the meaning of the section; that is to say, that all electors are duly qualified to hold office. Such reasoning is very fallacious. This provision was simply intended to limit the number from whom the various officers of this state might be chosen to those having a voice in the selection of such officers, and not in any sense intended to determine the qualifications necessary to properly discharge the duties of any office. For the electors to say in the constitution adopted by them that "no one but ourselves shall ever be elected or appointed to any office in this state" does not, by implication, say to the legislature, further, "You shall pass no law that will prevent any of us from holding office," for such an important matter as this would not be left to implication, if the electors had considered such a provision desirable.

While we have no decision in this state touching this question, the highest tribunals of other states have construed similar provisions in their state constitutions as above indicated. In the case of *Darrow* v *People*, 8 Col. 420 (8 Pac. 661) the Supreme Court of that state, in passing on the same question here raised, says: "Counsel argue that section 6, art. VII, of the constitution provides that 'no person except a qualified elector shall be elected to any civil or military office in the state,' by implication, inhibits the legislature from adding the property qualification under consideration. There is nothing in the constitution which expressly designates the qualifications of councilmen in a city or town, and this section contains the only language that can possibly be construed as applicable thereto. But it will be observed that the language used is negative in

form; that it simply prohibits the election or appointment to office of one not a qualified elector. There is no conflict between it and the statute. By providing that a supervisor or an alderman shall be a taxpayer, the legislature does not declare that he need not be an elector. Nor is the provision at all unreasonable. On the contrary, it is a safeguard of the highest importance to property owners within the corporation. The right to vote and the right to hold office must not be confused. Citizenship and the requisite sex, age and residence, constitute the individual a legal voter, but other qualifications are absolutely essential to the efficient performance of the duties connected with almost every office; and certainly no doubtful implication should be favored, for the purpose of denying the right to demand such additional qualifications as the nature of the particular office may reasonably require. We do not believe that the framers of the constitution, by this provision, intended to say that the right to vote should be the sole and exclusive test of eligibility to all civil offices, except as otherwise provided in the instrument itself; that no additional qualifications should ever be demanded, and no other disqualifications should be imposed. If, as has been well said, they 'had intended to take away from the legislature the power to name disqualifications for office, other than the one named in the constitution, it would not have been left to the very doubtful implication which is claimed from the provision under consideration.' *State* v. *Covington*, 29 Ohio St. 102." In the latter decision the court laid down the law in a syllabus as follows, to wit: "The provision in the constitution (section 4, art. 15) that no person shall be elected or appointed to any office in this state unless he possesses the qualifications of an elector does not by implication forbid the legislature to require other reasonable qualifications for office."

Second. The next claim of the counsel is that the latter clause of section 5, art. IV, is violated, which is in these words: "And no other oath, declaration, or test shall be required as a qualification unless herein otherwise provided;" his argument being that the freehold requirement is a test, within the meaning of the constitution. The asser-

tion is so unfounded as to hardly need refutation. This clause is simply an application of section 11, art. III, to the case of officeholders, which is in these words; "Sec. 11, Political tests, requiring persons as a pre-requisite to the enjoyment of their civil and political rights, to purge themselves by their own oaths of past alleged offences, are repugnant to the principles of free government and are cruel and oppressive. No religious or political test oath shall be required as a pre-requisite or qualification to vote, serve as a juror, sue, plead, appeal or pursue any profession or employment. Nor shall any person be deprived by law, of any right, or privilege, because of any act done prior to the passage of such law."

As will be seen at a glance, nothing is said about holding office, in this section, but it is made to apply alone to the right "to vote, serve as a juror, sue, plead, appeal or pursue any profession or employment." To remedy the omission here, the constitution makers added the clause to section 5, art. IV, which refers alone to religious and political tests as a pre-requisite or qualification for office, and has nothing whatever to do with any just qualification that the legislature may deem necessary to a proper discharge of the functions of the office.

In the case of *Rogers* v. *Common Council*, 123 N. Y. 173 (25 N. E. Rep. 274) the court of appeals construing the same provisions in New York constitution, says: "Still another ground of invalidity is alleged by the appellant. He says that the statute conflicts with article 12, which provides for the taking of an oath of office by members of the legislature and all officers, executive and judicial, before they enter on the duties of their respective offices, which oath is therein set forth; and it is there stated that 'no other oath, declaration or test shall be required as a qualification for any for office of public trust.' The statute by which an applicant appointment to a position in a public office is made to show his fitness therefor is claimed to constitute an illegal test, within the meaning of this section.  *  *  *

"We do not think that the provision above cited was ever intended to have any such broad construction. Looking at it as a matter of common sense, we are quite sure

that the framers of our organic law never intended to oppose a constitutional barrier to the right of the people, through their legislature, to enact laws which should have for their sole object the possession of fit and proper qualifications for the performance of the duties of a public office on the part of him who desired to be appointed to such office. So long as the means adopted to accomplish such end are appropriate therefor, they must be within the legislative power. The idea can not be entertained for one moment that any intelligent people would ever consent to so bind themselves with constitutional restrictions on the power of their own representatives as to prevent the adoption of any means by which to secure, if possible, honest and intelligent service in public office. No law involving any test other than fitness and ability to discharge the duties of the office could be legally enacted under cover of a purpose to ascertain or prescribe such fitness.

"Statutes looking only to the purpose of ascertaining whether candidates for an appointive office are possessed of those qualifications which are necessary for a fit and intelligent discharge of the duties pertaining to such office are not dangerous in their nature, and in their execution they are not liable to abuse, in any manner involving the liberties of the people * * * In this case, we simply hold that the imposing of a test, by means of which to secure the qualifications of a candidate for an appointive office, of a nature to enable him to properly and intelligently perform the duties of such office, violates no provision of the constitution."

The same reasoning would hold good in an elective office, so far as the section under discussion is concerned.

Third. The last claim of the counsel is that the provision complained of is in violation of section 8, art. IV of the constitution, in which the legislature is empowered to "prescribe by general laws the terms of office, powers, duties and compensation of all public officers and agents, and the manner in which they shall be elected, appointed and removed." This section includes all municipal officers, and was only intended to require the legislature to enact gen-

eral, and not special, laws in relation to the matters included in the section. But the counsel argue that "by granting the legislature the authority to establish offices, and provide the term of office, powers, duties, compensation and manner of election and removal, the power to add a qualification, not being given, is excluded by implication." The learned counsel appear to forget the difference so often defined between the federal and state constitutions; the former being strictly a grant of powers, while the latter is a limitation or restriction on the powers of the state legislature, which otherwise would be supreme in all legislative matters, as it is now in all cases wherein not restricted by the constitution—that instrument itself so declaring, as heretofore mentioned. And for the very reason that the power to prescribe qualifications is not mentioned in this section, the legislature has unrestricted control of that power. And it has been held by the court of appeals of another state that the same kind of provision gave the legislature entire control over all such officers ; that the power to prescribe the manner in which they shall be elected and appointed included within it, necessarily, the power to prescribe civil-service examinations, or to prescribe that they should be chosen from a class of citizens who possess some qualifications that specially fit them for office or render them efficient officers.

In the case of *People* v. *Clute,* 50 N. Y. 459, the court of appeals, construing this same provision, says : "There is no right bestowed by the constitution upon the elector to choose by vote to that office. But there is a gift from the legislature to the elector so to do, or rather a power thereby intrusted to him by the statute, which may be taken back again. Now, the authority which confers a power, and may take it away, may, in bestowing it, limit and restrict its exercise, as it sees fit, so far as it is not specially prohibited therefrom, and may, within that limit, say for how long, in what manner, and upon what objects it shall be exerted. Certainly, if the legislature may say to the voter, 'You shall not vote for any one for this office, but it shall be appointive,' it may say, 'You shall not vote for any one for this office who is not free from this disqualification

which we now declare.' The legislature may not put upon any elector a personal restriction from voting for any officer who may be elective, or whom it may declare elective, save such restriction as is imposed by the constitution, for from that it is especially prohibited. But it may, in the exercise of its judgment, for the public good, limit the number from whom the elector may select, for thus to legislate is within the general and sovereign power of legislation, which it constitutionally posesses." And in the syllabus the court lays down the law as follows, to wit: "Where the power is reserved to the legislature to direct the method of filling an office, whether by election or appointment, it may, in its discretion, when conferring upon the elector the power to elect, limit the number from whom he may select."

In this case the freehold requirement is not, technically speaking, a qualification, but it is a limitation by the legislature in conferring the right to vote, as to the number from whom the elector may select. It is the same as if the legislature had provided that the officers of the municipality must be chosen from among the freeholders thereof, the same as grand jurors are selected. This is not class legislation, because it is in the power of any one to become a freeholder, the same as it is in the power of any one to educate himself under civil-service rules. But it is clearly within the power of the legislature, even if, as the counsel claim, "there is no good reason for such law." Experience in municipal matters, and a wise consideration of the question will convince any unbiased mind that such a law has under it the very best of reasons

The fact that a man owns real estate has little bearing on the question as to whether he is capable of filling an office, but the real-estate owners are the substantial people of any communty—its bone and its sinew—and there are but few among them that do not have some property pride, and an interest in the welfare and prosperity of their permanent dwelling place. On the other hand, among those not owning real estate belong the floating population— those who are too trifling and unthrifty to want property, and those who, having wasted their substance in riotous

living, and spent their days in idleness are jealous of their neighbors' prosperity, and are ready to tear down, destroy, and scatter broadcast, the results of hard earnings, frugal management, and careful savings.    To them, although electors, the prosperity and welfare of the municipality amount to nothing, for like the Bedouins of the plains, 'neath the shadows of night they can fold their tents, and silently steal away, while, if there are any among the unfortunate but deserving poor who would make capable officers, their more successful neighbors are ever ready and willing to lend a helping hand, and see that they own the necessary "ten feet of ground."    It was no trouble for the relators to become freeholders, when they found a necessity for so doing.

A municipal corporation is the legislative grant of local self-government to the inhabitants within a certain designated territory, which is known as the "city," "town," or "village," and corporate powers granted are exercised by its inhabitants in its corporate name.    The freeholders of such municipality own every foot thereof, and the benefits derived therefrom are enjoyed, and the burdens borne, almost entirely by them.    The loss or gain of the municipality is their loss or gain.    They favor just and reasonable taxation, because it increases the general welfare, and thereby is beneficial to their private interests.    They oppose excessive and injudicious expenditures of public levies, because the waste must fall heaviest on them.    They therefore have an interest that makes them efficient and reliable municipal officers.    While the office of councilman is the most important office, within its limited jurisdiction, of any in the State—combining, as it does, legislative, judicial, executive, and ministerial powers—there is usually no pay, and but little honor, attached to such office, and the burden and annoyance are exceedingly heavy.

A competent man, who has no sufficient interest in the community to become a freeholder, does not care to give his time, endure the labors, and suffer the annoyance of the office, simply to improve the property of others; and sometimes it is almost impossible to induce competent freeholders to undertake it, however great their interests may

be. By making it exclusive, the office is rendered more important, and it devolves upon the freeholder, as a duty to accept. Under our system of government, all officers are but the servants of the people, and it is but just that the people should have the best service possible; and in endeavoring to secure this, for the public weal, the legislature has wisely incorporated this provision in the general law relating to the incorporation of cities, towns, and villages, and it is now in the special charter of nearly every city and town of over two thousand inhabitants. It is further plain, under our statutory law, the candidate must be a freeholder at the time he is voted for, because the voter has a right to presume that the candidate is eligible to the office at the time he asks his suffrage; otherwise, the election is void. The election law especially requires that, in nominating candidates for office, they shall be certified to be legally qualified to hold the office for which nominated. But it is not necessary to decide this question at the present time, except as a mere *dictum*.

The constitutional question being out of the way, the only other question that presents itself is whether *mandamus* is the proper remedy to review the action of a municipal council in determining, under the law, that a candidate is not legally qualified to hold the office. This entirely depends on the fact as to whether the council, in so determining, was acting within the limits of its authority, or assuming a jurisdiction it did not possess. *Mandamus* is not a proper remedy to control the action of a municipal body, when acting within the scope of its legal powers, but only when it refuses to act at all, or is acting without legislative authority. *Supervisors* v. *Minturn*, 4 W. Va. 300.

Section 23, c. 47, Code, provides: "All contested elections shall be heard and decided by the council." This constitutes the council a special tribunal to judge of the election and qualification of its own members. The counsel, in argument, places the question of contest on too narrow grounds. He would limit it to the case where two persons are claiming the same office by election. Where there are substantial doubts as to whether a candidate elected to office is eligible or not, any citizen interested, as tax-

payer or elector, would have the right to raise the objection and it would then become the duty of the council, as the only tribunal in which the authority is vested, to promptly hear and determine the matter.   This gives a quick and speedy hearing, while the office might expire before a determination was reached, if left to the courts.   In the case of a miscarriage of justice before the council, chapter 110, § 2, provides for a review of the decision of the council by means of *certiorari;* and in case of reversal, and disobedience on the part of the council, which is not at all probable, a way would be found to compel respect to the orders of superior judicial tribunals.

The judgment of the Circuit Court is reversed, the *mandamus nisi* is quashed, and these proceedings are dismissed, at the costs of the relators.

Holt, Judge (*concurring.*)

Section 13 of chapter 47 reads: "The municipal authorities of such city, town or village shall be the mayor, recorder and the councilmen, who shall be freeholders therein and who together shall form a common council."   I do not think the freehold qualification unconstitutional.   These offices are created, not by the constitution, but by the legislature, in the exercise of its inherent, plenary, legislative power, qualified so as to require a general law for incorporating cities, towns, or villages containing a population of less than two thousand.   Section 8, art. IV, of the constitution provides that in such cases, among others, the legislature shall prescribe the manner in which they shall be elected, appointed, and removed, and leaves it to the legislature to say from what body of persons they shall be elected or appointed, but with this qualification : that, being municipal officers, the negative provision of section 8 of article IV of the constitution applies—they must in any event, be citizens of the state, entitled to vote; for, if the constitution is to be taken as prescribing exhaustively the qualifications of such municipal officers created by law, as well as of those officers created by the constitution itself,

then section 21 of chapter 47, saying that the mayor, recorder, and councilmen must be residents of such city, *etc.*, is also unconstitutional; and a resident of the city of Pocatalico could be legally elected mayor of the city of Charleston, and a resident of the city of Charleston could be legally elected mayor of the city of Pocatalico. So there are many other equally obvious and indispensable qualifications for various offices which the legislature has created, and may yet create, under its inherent, plenary, legislative power over the subject. See *State* v. *Covington*, 29 Ohio St. 118; *Darrow* v. *People*, 8 Col. 417, 420 (8 Pac. 661); Mechem, Pub. Off. § 96; *Rogers* v. *Common Council*, 123 N. Y. 173 (25 N. E. Rep. 274).

I regard the power of the legislature, inherent, as well as given by section 8 of article IV, as comprehending the power to create these municipal offices, and prescribe the qualifications of such as are appointed or elected to fill them; and that the statute, in so far as it requires them to be freeholders of the town, should not be declared void on account of an implication that might at first blush seem to arise from the negative provision contained in section 5 of the same article of the constitution. Plenary power in the legislature is the rule. There can be no restriction, except what the constitution of the United States or of the state prescribes. Therefore, it is for those who question the validity of the statute to point out where and how it is forbidden, and if this is not made clear and palpable, beyond reasonable doubt, such doubt must be solved in favor of the legislative power, and the act must be sustained; and this, if no other good reason were apparent, is sufficient. For twenty years (1877) it has been practically interpreted as constitutional by the action of all departments of the government, and it would now create a great confusion and inconvenience to hold it void; and this in the case of special charters as well as in the case of the general law. Great weight is always rightly attached to such long, contemporaneous, practical exposition. See *Bridges* v. *Shallcross*, 6 W. Va. 562; and the authorities cited by Judge Haymond.

BRANNON, JUDGE (*dissenting*).

Not concurring in the judgment in this case, I file without revision, to express my views, the following opinion prepared by me, but which did not meet with the approval of the court, as will appear in opinions prepared by Judges DENT and HOLT:

1. *Freehold Qualification for Town Officers.*
2. *Test for Officers.*
3. *Who is a Freeholder?*
4. *Curtesy in Separate Estate.*
5. *Qualification for Officers.*
6. *Two Uniting in one Mandamus.*
7. *Is Mandamus the Remedy in this Case?*

John M. Thompson and C. A. Smith were elected on January 5, 1893, at a municipal election for the town of Hurricane, Putnam county, as members of its council; but the council refused to allow them to enter into office, upon the ground that at the date of the election they were not freeholders, and allowed W. L. Losee, and W. S. Turley, incumbents in said office, to continue to act therein until their successors should be elected and qualified. Upon a writ of *mandamus* the Circuit Court gave judgment for the claimants Thompson and Smith. The writ ran to the mayor, recorder, and councilmen, including Losee and Turley and they, except Mynes and Dunfee, councilmen, bring the case here by writ of error. A number of important questions arise on the record, involving principles of great practical import:

First question: If the claimants were not freeholders, would that fact disqualify them from being councilmen? The town was incorporated under the general law found in chapter 47 of the Code, and as section 13 requires the mayor, recorder, and councilmen to be freeholders, it is claimed that claimants are disqualified. If this be so, then a resident of this town may be a voter, and qualified to be elected governor of the state, and yet be ineligible to the town-council. The claimants are qualified voters. Are they qualified to hold these offices? Is the freehold qualification demanded by the statute unconstitutional?

Section 1, Art. IV, of the constitution reads. "The

male citizens of the state shall be entitled to vote at all elections held within the counties in which they respectively reside," with various exceptions in that section specified. Here is a broad declaration that all male citizens shall be entitled to vote, with specific exceptions. Other exceptions can not be made by the legislature. Plainly, it was the purpose, by this section in the organic law, to point out and make clear and certain, in what particular persons among the people of the state the sovereign power of the ballot resides. If we wish to know who is the voter, we look here, and here alone. It vests in the citizen this great right. It can not be taken from him by legistion. If he falls within the general grant in the opening clause of the section, and not within any of its exceptions, he is a suffragan, over any power that would deny his right or add another qualification. Cooley, Const. Lim. 753. He is a voter, though as poor as Lazarus. But has he another great privilege—right, I should say?—for it is hard to say which is the higher right in the freeman—that of voting, or that of being voted for. The constitution has granted the citizen the ballot. Has it forgotten his right to hold public office? It has carefully defined the qualification of voters, in the well-drawn section quoted. Has it failed to define the qualification of officers? Having defined the qualifications of voters, it was not to be supposed that it would omit the very important matter of defining who might be officers. It has not omitted to do so: It makes the one right practically the correlative of the other. To the citizen clothed with the right of suffrage is given also the right of holding office. It should be so, and it is so.

Section 4 of article IV provides that "no person except citizens entitled to vote, shall be elected or appointed to any state, county or municipal office; but the governor and judges must have attained the age of thirty, and the attorney-general the age of twenty five years, at the beginning of their respective terms of service; and must have been citizens of the state for five years next preceding their election or appointment, or be citizens at the time this constitution goes into operation."

This does not in affirmative express terms declare that a

voter shall be competent to hold office, as does the first section say that all male citizens shall be voters. It could have been better drawn, for present purposes, by declaring that any one who is a voter shall be competent to be elected or appointed to office, but the section means that. We must read sections 1 and 4 together, as if *in pari materia*, because they deal with two kindred subjects, and they are located close together. Section 1 has just defined the qualifications of voters. Section 4 takes up the subject of qualifications of officers, and in saying that no person but citizens entitled to vote shall be eligible to office, it, by implication—by strong and plain implication—means to declare that a citizen entitled to vote shall likewise, because of his quality of voter, be entitled to be elected or appointed to office. In saying that none but voters shall be officers, it means to assert the converse—that voters shall have right to be officers. It is a negative pregnant. A reading of the two sections will more strongly impress one that such is the meaning of the fourth section than can be conveyed in words of explanation or construction. The negative mode of expression was used in the section, likely, to exclude all persons not voters from office; for, if it had said that all voters should be eligible to office, it might have been contended that persons not voters might be made eligible to office, while under the section as it is, in the negative form, that is prohibited. But surely it did not mean to leave the gate swinging, so as to let any power disable a voter from holding office. When it says that one not a voter shall not hold an office, does it not impliedly say that a voter may hold office? That it meant, not simply to exclude those not voters from office, but at the same time to confer upon voters the right to hold office, is shown by the fact that the section goes on to prescribe certain qualifications for governor, judges, attorney-general, and senators. Why touch the subject of qualification for office at all, if the section had for its aim only to exclude non-voters? The convention, knowing that by delaring that none but voters should become officers, it had vested in voters the right to become officers, and desiring to require, as to governor, judges, and senators, certain qualifications in addi-

tion to their being voters, made the specific additional requirements as to them.

Comparing this section 4, art. III, as found in the constitution of 1863, with that in the present one, we notice the insertion in the present constitution of the word "but," not till then found in the section. In the former constitution, it read: . "No persons, except citizens entitled to vote, shall be elected or appointed to any state, county or municipal office. Judges must have attained the age of thirty five years, the governor the age of thirty years," *etc.* In the present constitution it reads: "No person except citizens entitled to vote, shall be elected or appointed to any state, county or municipal office; but the governor and judges must have attained the age of thirty," *etc.* The insertion of the word "but" indicates that the convention knew that the first clause expressed a general rule or definition of qualification for office, admitting all voters to the right; and as governor, judges, senators, and attorney-general would fall within it, unless excepted, and desiring to except them, it, for safety, inserted the word, to make it more clear than it had been. In other words, it is an exception, the same as if, after allowing all voters to be chosen to office, it had said, "except that the governor and judges must have attained the age," *etc.* Why the necessity of exception, if there is no general rule? Thus, to be a voter is to be also qualified to take office; to be a voter is the correlative of the right to be an officer, except as regards governor, judges, senators, and attorney-general, to the extent, as to them, specified in section 4. Judge BROWN so construed a similar section in the constitution of 1863, in *Phares* v. *State*, 3 W. Va. 569, saying: "The constitution prescribes who are entitled to vote, and it also provides that any person so entitled to vote shall be eligible to office."

I will propound two questions, which I will assume to think are decisive. Can the legislature enact that the governor, judges, or senators must be freeholders? No, because the constitution only requires that they be voters, and of certain age, and no other qualifications can be exacted. The naming those shows that no others were

intended.   Can the legislature enact that the auditor and
treasurer must be freeholders?   I answer no, as I do as to
governor, because the constitution  has only required that
they be voters.   The only difference is that as to governor,
judges, and senators, further qualifications are exacted.   Will
it be contended by any one that the legislature may exclude a
voter from the auditorship because he is not an owner of
realty?   If it can not, it is only because of this constitutional
provision.

Section 8 empowers the legislature to "prescribe by
general laws, the terms of office, powers, duties and com-
pensation of all public officers and agents, and the man-
ner in which they shall be elected, appointed and re-
moved."   It does not give the legislature power to pre-
scribe the qualifications of officers.   If the convention
had left open that important matter, it would be expect-
ed that it would, in the section just quoted, grant to the
legislature the necessary function or power of prescrib-
ing such qualification; but it did not so, and simply be-
cause it had itself done so in section 4.   Can we suppose
that the framers of the constitution intended to leave open
that most important matter—important as it concerns the
rights of individual citizens, and more important as it con-
cerns the vital interests of all the people of the state in the
administration of its government—namely, the qualification
for office, leaving it subject to the fluctuation of sentiment,
the caprices of constantly changing legislatures, the pas-
sions of the hour?   The very idea of a written constitution
of government tells us that the definition of eligibility
to official station should be, and would be, one of the very
first subjects dealt with in it.   If section 4 does not perform
this function, where do we find it?   There is no statute
defining qualification for office.   The legislature has always
understood that the constitution did this work ; for the
legislature of 1863, passing a general election law under the
constitution of 1863, which contained a like section to sec-
tion 4 now under discussion, did not define the qualifications
for office.   Neither did the legislature of 1872–73, passing
a general election law under the present constitution.
Neither did the legislatures of 1882 and 1891, in the general
election laws passed in those years.   Four general election

laws have been passed in twenty eight years, none defining the qualifications for office. I have not found where the legislature has done so in any act. Thus, we have the contemporaneous construction by the legislative department of government through many years and a great mass of legislation to the effect that the constitution prescribed and fixed the qualifications of officers. This has great effect. Cooley, Const. Lim. 81.

Counsel for appellee argues that the fact that section 6 requires officers to take an oath, and closes with the injunction that "no other oath, or declaration or test shall be required as a qualification, unless herein otherwise provided," would forbid the freehold requirement. It would, if we could consider it a "test," within the meaning of this provision; but, from the first thought, I doubted whether it would apply to a property qualification or an educational qualification, though the words "unless herein otherwise provided" might favor, slightly, such contention. My inclination was to regard matters of opinion or bias or political action as here referred to. We know that this prohibition had its birth and suggestion in the existence of test oaths springing from the passions and excitement of the civil war, designed to exclude participants therein, on the Confederate side, from holding office. English history tells us of test acts, and they relate to matters of opinion, cheifly religious opinion, like that in 25 Car. II., requiring an oath from officers against transubstantiation, and requiring them to take the sacrament under the English church; and that earlier in the same reign, called the "Corporation Act," requiring officers to renounce the covenant; and also the uniformity act, requiring clergymen to assent to everything in the Book of Common Prayer. So far as advised, from authority here accessible, I think this provision against tests relates to opinion, and not such as a property qualification. See Story, Const. §§ 1847, 1849, and 6th Vol. Hume's History of England, 117, 187. I have met with the cases of *Attorney General* v. *Detroit Common Council*, 58 Mich. 213 (24 N. W. Rep. 887) where it is held, that a provision in the Michigan constitution just like the one in ours does not apply to those special qualifications re-

quired for particular offices. The opinions in that case, and also the opinion on pages 91, 92, in the case of *People* v. *Hurbut*, 24 Mich., will sustain the view I have just expressed as to the meaning of the word "test" as here used. I have also met with *Rogers* v. *Common Council*, 123 N. Y. 173 (25 N. E. Rep. 274) holding same view.

Therefore, as section 4 confers upon the voter the capacity to take office, with the exceptions therein stated, the legislature does not possess the power to add to those exceptions, any more than it possesses power to disfranchise a citizen from voting by prescribing qualifications or exceptions beyond those stated in section 1.

The legislature can not establish arbitrary exclusions from office, or any general regulations requiring qualifications not required by the constitution, except for crime. Cooley, Const. Lim. (4th Ed.) 78; *Barker* v. *People*, 3 Cow. 686; *Black* v. *Trower*, 79 Va. 123; *Thomas* v. *Owens*, 4 Md. 189; *Page* v. *Hardin*, 8 B. Mon. 648. Chancellor Sanford, in *Barker* v. *People, supra*, used this language:

"Eligibility to public trusts is claimed as a constitutional right which can not be abridged or impaired. The constitution establishes and defines the right of suffrage, and gives to the electors and to various authorities the power to confer public trusts. It declares that ministers of religion shall be ineligible to any office. It prescribes, in respect to certain officers, particular circumstances without which a person is not eligible to those stations (as does ours) and it provides that persons holding certain offices shall hold no other public trust. (So does ours.) Excepting particular exclusions thus established, the electors and the appointing powers are, by the constitution, wholly free to confer public station upon any person, according to their pleasure. The constitution giving the right of election and the right of appointment, these rights consisting essentially in the freedom of choice, and the constitution also declaring that certain persons are not eligible to office, it follows from those powers and provisions that all other persons are eligible. Eligibility to office is not declared as a right or principle by any express terms of the constitution, but it results as a just deduction from the express powers and pro-

visions of the system. The basis of the principle is the absolute liberty of the electors and the appointing authorities to choose and to appoint any person who is not made ineligible by the constitution. Eligibility to office, therefore, belongs not exclusively or especially to electors enjoying the right of suffrage. It belongs to all persons whomsoever, not excluded by the constitution. I therefore conceive it to be entirely clear that the legislature can not establish arbitrary exclusion from office, or any general regulations requiring qualifications which the constitution has not required. If, for example, it should be enacted by law that all physicians, or all persons of a particular religious sect, should be ineligible to public trusts, or that all persons not possessing a certain amount of property should be excluded, or that a member of the assembly must be a freeholder, any such regulation would be an infringement of the constitution; and it would be so because, should it prevail, it would be, in effect, an alteration of the constitution."

Now, observe that Chancellor Sanford goes beyond where I need go; for he says that, without anything in the constitution expressly defining qualifications for officers, the mere fact that certain persons were by the New York constitution excluded, as is the case with us, is sufficient, alone, to vest in others not excluded the right to take office, or in the voters the range of choice from all not excluded. There was no such section as our section 4 for the chancellor to rely upon. If his proposition was right, how much more can I assert that the position here taken is right, where we have a section 4 excluding only nonvoters, and leaving it to be understood that all who are voters shall be allowed to receive office? This common principle of construction is illustrated in *Donaldson* v. *Voltz*, 19 W. Va. 156, holding that as the constitution, after granting exemption from execution, had specified certain exceptions, the legislature could not add rent. The expression of certain exceptions excluded others.

We have been under the impression that the property qualification for office had been, many years ago, abolished by change in constitutional law. It surely has not been restored, and can not be, but by a change in the constitution.

It will not do to say that, while it may not be demanded as to state and county office, it may be as to municipal offices; for section 4 includes them in terms. Were this not so, I would hold a different opinion. So I hold that the want of freehold qualification does not exclude from holding the position of councilman. It can not be true that a man may be elected governor, and yet can not be elected a town councilman, merely because though a voter he is not a freeholder. This would impress one as an absurdity and injustice. Ought the local taxing power be vested only in the property owner? Members of the legislature, vested with greater taxing powers, need not be freeholders.

The only cases cited in support of the contention that the freehold qualification is not unconstitutional are *State* v. *Covington*, 29 Ohio St. 102, and *Darrow* v. *People*, 8 Col. 417 (8 Pac. 661). In the former it is held that the provision in the Ohio constitution that "no person shall be elected or appointed to any office unless he possesses the qualifications of an elector" does not forbid, by implication, the legislature to require other reasonable qualifications for office. The reasoning on the point is short and unsatisfactory. The judge says the power of the legislature should not be denied by mere implication, unless clear. He thought it was not clear. I think it very clear. But I add that it does not appear that the clause in the Ohio constitution containing the negative words had, as ours has, the feature of prescribing qualifications as to governor, judges, and senators, nor the section giving the legislature power only to prescribe terms, compensation, and manner of choice of officers, but failing to give it power to fix qualifications. The Colorado constitution is the same in effect as that of Ohio. The remarks just made apply to the Colorado case; and I note the fact specially, that in neither the Ohio nor the Colorado constitutions did the clause include municipal offices, as ours does. The Colorado court says that the clause in the Colorado constitution had no relation to municipal officers. The decisions are of less authority because of that fact. If one additional material qualification may be prescribed, why not another? Why not many others?

The constitution is fundamental law, and should be strictly construed in defence of the citizen's rights. It is the *Magna Charta* of his freedom and rights, political and civil.    Admit once that it does not fix his qualification for office. Where would his disfranchisement end? That would depend upon uncertain political, religious, or other winds. Would we limit the act within the bounds of the reasonable?    That would be indefinite, unsafe, precarious—dependent upon the times and motives and aims dominating them.    Against these things it was intended to imbed the right in the solid rock of the constitution.    If we say it might have been imbedded in plainer language, yet we must look at the policy—the evil against which it was intended to provide.

I do not say that no provision or qualification whatever that is reasonable—essential to fit the party for the duty —may not be prescribed.    I lay down a general rule.    But I say this freehold test is not reasonable or necessary to make a man a competent or suitable officer.    The Virginia court, passing on the constitutional clause giving all voters the right to hold office, held void an act requiring members of electoral boards to be freeholders.    It admitted that there might be cases where, by implication, an additional qualification might be imposed, when it was essential to the discharge of the duties of the place, but the qualification of freehold could not be justified on this theory.    *Black* v. *Trower*, 79 Va. 153.

Another question:    Were Thompson and Smith freeholders when elected?    Smith held land under a purchase evidenced by a title-bond providing for a conveyance on payment of purchase-money, and was in possession, but had not paid for the land.    He thus had an equitable estate in fee simple.    A freehold may be in an equitable estate as well as legal estate, as authorities below cited show. There is nothing, then, to prevent his being a freeholder, but non-payment of purchase-money.    Shall a man owning land, in possession, who happens to owe yet a little purchase-money, be deemed not a freeholder?    The only reason is that he is not entitled to call for a conveyance of the legal estate.    But he has a vested interest or property

in the land, recognized by law. In the eye of equity, he is the owner of the land, holding in trust for his vendor only for purchase-money, while the vendor holds the legal estate in trust for him, and is entitled only to the money. A court of law would recognize his right by giving him an action of trespass. If the law were that, to be a freeholder he must have legal title, it would be different, but Virginia cases of binding authority repel that idea. It is ancient law that the *cestui que* use is a freeholder, so as to be a good juror. Co. Litt. 272b; 4 Bac. Abr. 556, tit. "Juries." But as to such cases I think the statute of uses would execute the use to the possession, and give good legal title.

*Helmondollor's Case*, 4 Gratt. 536, held that one having the equitable interest in land, entitled to call for the legal title, is a freeholder; and it is stated that, among many Virginia cases, no one denies that a *cestui que trust* of a freehold estate is a good grand juror, who is required to be a freeholder. In *Cunningham's Case*, 6 Gratt. 695, a purchaser, by oral contract, in possession, who had paid for the land, was held to be a freeholder. In *Carter's Case*, 2 Va. Cas. 319, it was held that a grantor, who had passed away the legal title by deed of trust and had merely the equity of redemption, was a freeholder. In *Moore's Case*, 9 Leigh. 639, the owner conveyed the land to a trustee to secure a debt, and then such owner conveyed to another person his equity of redemption, and put him in possession, and this person was held to be a freeholder.

So the legal title in the person is clearly not necessary to constitute him a freeholder. And upon the strength of *Burcher's Case*, 2 Rob. (Va.) 826, I conclude that the fact, that Smith owed yet some purchase-money, does not prevent his being a freeholder. It decided that a person was a freeholder who was in possession under a purchase, the deed to him not being delivered to him, but in the hands of another, as an escrow, to be delivered on payment of purchase-money, which remained partially unpaid. The opinion said, as I now say: "It seems sufficient if the juror is in possession of a freehold estate, and enjoying the profits and substantial ownership thereof;" that he was in lawful possession, and a court of equity would regard the land as

the purchaser's property, and, if he failed to pay, would not turn him out, but give him a day to pay, and then sell the land as his, and pay him any surplus of its proceeds after payment of the debt.

If that was so at the date of that decision, when the court of law did not recognize the equitable title, or its owner as having any title, but would turn the purchaser out by ejectment at the suit of the vendor, how much more should we hold it to be law now, when section 20, c. 90, of the Code compels the court of law to view the purchaser's right as a substantial right, by declaring that a vendor shall not at law recover against the vendee land sold by the vendor to such vendee, when there is a writing stating the purchase and its terms?

The heading in *Reynold's Case*, 4 Leigh, 663, says that it seems that one who has contracted, by article under seal, to sell his land, but has not conveyed it, and still holds the legal title, is a freeholder—that is, the vendor; and therefore it may be said that if the vendor is a freeholder the vendee can not be a freeholder in the self-same land. But that statement is not binding, because the court says it did not decide it, as that question was not adjourned to it; and, secondly, it is true, as said by Judge Gholson in *Burcher's Case, supra*, that the vendor only agreed to sell on certain conditions precedent to be complied with by the vendee, and the record did not show that they had been performed, or a dollar paid, or that any title had been made, or even that possession had passed to the vendee. I hold that the want of legal title or failure to pay purchase-money does not settle that the party is not a freeholder. Is he in possession of land, claiming freehold estate, by right, legal or equitable, recognized by law, whether the purchase-money had been paid or not? If yes, then he is a freeholder. Therefore, Smith was a freeholder.

Another question: Was Thompson a freeholder when elected? His wife owned an estate in fee in land. We do not know by record when she acquired it, so as to say whether it was separate estate, nor whether there was issue by the marriage. But in no conceivable view upon the record as it is was Thompson a freeholder when elected. If we

could see that the wife acquired the land, and the marriage took place before the married woman's separate estate.act (April 1, 1869) we could say that he was a freeholder, because by marriage simply he was entitled to possession and rents and profits during the joint lives of himself and wife. *Pickens' Ex'rs* v. *Kniseley*, 36 W. Va. 794, 800 (15 S. E. Rep. 997). It would be a freehold, as it would continue during their joint lives, at least. 2 Kent. Comm. 130; *Dejarnatte* v. *Allen*, 5 Gratt. 499, 513; Schou. Husb. & Wife, §§ 167, 181; Schou. Dom. Rel. §§ 89, 201. Thompson would also be a freeholder by reason of being invested with an estate by the curtesy initiate, though it does not appear that there was issue of the marriage, as such an estate is freehold, since it exists for the life of husband. It is true that at common-law there must be issue, to create an estate by curtesy initiate. 2 Bl. Comm. 126; 2 Min. Inst. 103. And under our statute (Code, c. 65, § 15) as it stood up to the act of March 20, 1882, notwithstanding it broadly declared that "if a married woman die seized of an estate of inheritance in lands, her husband shall be tenant by the curtesy in the same," yet *Winkler* v. *Winkler*, 18 W. Va. 455, construed it as not dispensing with any of the four common-law requisites of curtesy. But chapter 86, Acts 1882, amended said Code, § 15, by utterly dispensing with issue as an element in curtesy; and I think it would operate to vest in the husband an estate by curtesy initiate, as here would be an estate of inheritance, not separate estate, vested in the wife during coverture But we can not say that the land vested in the wife, and the marriage took place before April 1, 1869.

If, on the other hand, we suppose that the wife acquired this land after April 1, 1869, it being thus separate estate under section 2, c. 66, Code 1891 (chapter 65, § 3, Code 1887) the wife yet living, the husband could not be tenant by the curtesy initiate. It has been seriously questioned whether a husband could, by force of common-law, take an estate by curtesy in the separate real estate of his wife; but the better opinion—and the law here, as settled in *Winkler* v. *Winkler*, 18 W. Va. 455—is that he can. That question—that is, whether the common-law would, alone,

give him such estate—is, however, unimportant practically, because the statute would certainly give it. Code, c. 65, s. 15; opinion in case just cited (page 468.)

But there is this distinction between an estate by curtesy in lands of the wife, not separate estate, and lands that are her separate estate, namely, that in lands not her separate estate there is curtesy initiate, whereas, in lands that are separate estate, there can not be curtesy initiate, but only curtesy consummate. In other words until the death of the wife no estate whatever in her lands vests in the husband. He has, while she lives, only a chance or possibility of becoming clothed with an estate upon the event of the death of the wife before his death. This is because the separate estate statute declares that the wife shall hold her separate estate and its issues, rents, and profits to her sole and separate use, as if she were single, free from the control or disposal of her husband. This statute is in letter, spirit, and purpose plainly inconsistent with the existence of any substantial estate of the husband in her land while she lives. See *Breeding* v. *Davis*, 77 Va. 639; *Alexander* v. *Alexander*, 85 Va. 344 (7 S. E. Rep. 335); Wells, Mar. Wom. 106; *Hill* v. *Chambers*, 30 Mich. 422; *Porch* v. *Fries*, 18 N. J. Eq. 204; *Thurber* v. *Townsend*, 22 N. Y. 517; *Beach* v. *Miller*, 51 Ill. 206; *Cole* v. *Van Riper*, 44 Ill. 58; *Stewart* v. *Ross*, 50 Miss. 776; 4 Am. & Eng. Enc. Law, 967; *Billings* v. *Baker*, 28 Barb. 343. Therefore, Thompson was not a freeholder when elected.

Another question: But both Smith and Thompson, after election and before their term of office began, acquired land and became freeholders. This raises the question whether, though they were not freeholders when elected, it is enough that they were when their terms began. Much difference of opinion has existed in the courts upon this question. Where the constitution or statute declares that only certain persons shall be elected or be eligible to office, it may be plausibly contended that it refers to the date of the election, and that one not so qualified can not be elected to and can not hold the office, though he become so qualified before his term begins. But, even in such case, highly respectable authorities hold that it is sufficient if

he be so qualified at the commencement of the term. Some authorities for the former view are *Searcy* v. *Crow*, 15 Cal. 117; *State* v. *McMillen*, 23 Neb. 385 (36 N. W. Rep. 587); *Taylor* v. *Sullivan*, 45 Minn. 309 (47 N. W. Rep. 802); *State* v. *Clarke*, 3 Nev. 566; *State* v. *Williams*, 99 Mo. 291 (12 S. W. Rep. 905). Some authorities for the latter view are *Smith* v. *Moore*, 90 Ind. 294; *Brown* v. *Goben*, 122 Ind. 113 (23 N. E. Rep. 519); *State* v. *Murray*, 28 Wis. 96; *State* v. *Trumpf*, 50 Wis. 103 (5 N. W. Rep. 876, and 6 N. W. Rep. 512). The latter view derives additional force by the fact that the votes cast for the ineligible candidate are not necessarily void. If they were, there would be more reason to say that he could not even be voted for; but they are so far votes, so far effectual, that if the ineligibility be not known to the voters, or be not such as they are bound to know, the minority candidate, is not elected, and can not claim the office. *Dryden* v. *Swinburne*, 20 W. Va. 89.

But we are not called upon to say which of those views is correct, because in this case the statute cited to disable these claimants from holding their offices does not say that only freeholders shall be chosen or elected or be eligible, but says, "The municipal authorities of such city, town or village shall be a mayor, recorder and councilmen, who shall be freeholders therein." This simply says that to be such officers they must be freeholders. It only means that the powers and functions of these offices shall be wielded only by freeholders. Why defeat the popular will, this being the language, by mere construction, simply because, when elected, the persons elected were not freeholders, when at the time they actually act in office they are? The letter of the act does not require it, neither does its spirit, since its object is only to keep nonfreeholders from acting in office. It was meant, not as a prohibition against their election, but against their holding office. Authority will sustain this position.

In *Privett* v. *Bickford*, 26 Kan. 52, the constitution provided that no person, who had borne arms against the United States, should be "qualified to vote or hold office unless his disability should be removed," and it was held that though disqualified when elected, if the person's dis-

abilities be removed before taking office, it was sufficient.

In *State* v. *Murray*, 28 Wis. 96 it was held that an alien at date of election, but naturalized at beginning of term, could hold.

In *De Turk* v. *Com.*, 129 Pa. St. 159 (18 Atl. 757) the constitution provided that no one holding office under the United States should "hold or exercise any office in this state." A postmaster, when chosen county commissioner, resigned as postmaster, even after *quo warranto* begun to oust him as commissioner, and it was held he was competent to hold.

In *Com.* v. *Pyle*, 18 Pa. St. 519, it was held that, "where one would be ineligible to office on account of disqualification, he must get rid of the disqualification before he is appointed or elected; but, where the prohibition extends only to the enjoyment or exercise of an office, it is sufficient that the person be qualified before he is sworn."

The United States constitution says, "No one shall be a representative" who is not of a certain age, or has engaged in rebellion; but John Young Brown, under age at date of election, and others under disability when elected, but becoming of age, and whose disabilities had been removed, have been admitted to the house of representatives and senate. *McCrary Elect.* § 258.

Therefore, I conclude that it is sufficient that the plaintiffs were freeholders at the commencement of their terms.

Another question: Can both Smith and Thompson unite in one writ of *mandamus?* The rule is that, where the interests of several relators are separate and independent, they can not join in one writ of *mandamus*, any more than in another form of action. High, Extr. Rem. § 439; 14 Am. & Eng. Enc. Law, 219. But this is a peculiar case, as to this point; and, if any case would justify a joinder of two interests, this would. The offices may be deemed separate, it is true; but they are claims to seats in a body composed of numerous members, elected simply to that body, not to any particular places or seats therein, not by separate wards, but for the whole town, by all its voters, at one election. Their places are held by Losee and Turley. Which one of these parties holds Thompson's place?

Neither one more than the other. Suppose Thompson to sue alone, simply for the admission to the board of councilmen. If he were admitted, whom would he oust—Losee or Turley? Would the council say which one? If it did, it would simply do so arbitrarily, or by lot, for it would have no rule to go by. Perhaps Thompson might ask Losee's place alone, and have order for his amotion. But what if Smith, also, asked the place of Losee? And perhaps, if he sued for Losee's place, Losee might say that he did not withhold his place, any more than did Turley. Would not, if we assert that both should sue separately, either be entitled simply to ask admission generally, without asking the place of either Losee or Turley? If so, is it not better to tolerate a joint application for both Losee's and Turley's seats? Precedents are found fully justifying this joint writ.

Two persons joined in one writ to be sworn in as church wardens. *Reg.* v. *Guise,* 2 Ld. Raym. 1008; *Reg.* v. *Twitty,* 2 Salk, 433; *King* v. *Middlesex,* 30 E. C. L. 286; *Reg.* v. *Heathcote,* 10 Mod. 48. In *Manns* v. *Givens,* 7 Leigh. 689, seven persons held as slaves, claiming manumission under one and the same deed, joined in one *mandamus* to compel its recordation, and no objection was thought of, for misjoinder. True, they all claimed under one deed, but each one's freedom was a separate right annexed to his person only. These parties claim under one election, which is one element for consideration. Nineteen persons appointed as a board of visitors to a college sued out, without objection, a joint writ against that number, constituting the old board, to try title. *Lewis* v. *Whittle,* 77 Va. 415. In a case reported in 43 La. Ann. 92, (8 South. 893) *State* v. *Shakespeare* several councilmen of New Orleans, turned out of the board, took one *mandamus* to obtain restoration, and it was held that they could so sue. The opinion in *Haskins* v. *Board,* 51 Miss. 410, using language probably of Merrill, (Mand. § 232) states the principle that "relators must have a right common to all of them; must have a joint benefit in the performance of the act of duty required of respondent, and be joint sufferers because of the non-doing. Otherwise, they can not unite in this suit." Does not the plaintiffs' case come within that statement of the principle?

Though I have had some question on this point, I conclude that there is no error in the use of the writ jointly by Smith and Thompson.

Another question: It is contended that *mandamus* does not lie, but that *certiorari* is the proper remedy. The council canvassed the election returns, and declared by its order that Smith and Thompson received the highest number of votes. There was no complaint of error in its action touching the election to call for *certiorari*, but after declaring them elected, the council refused to admit them. This called for *mandamus*, not *certiorari*. That *mandamus* has been long used in the Virginias as a proper process to try title to office, and compel admission of him who has title to it, is well settled. In the great, I may say historic, case of *Bridges* v. *Shallcross*, 6 W. Va. 562, where every inch of ground of the slightest value was hotly contested, wherein Bridges sought to enforce his title and admission to the office of superintendent of the penitentiary, the efficacy of the writ was not even questioned; and Judge Haymond said that, if it had been, the objection could not have been maintained. I shall not discuss the matter, being satisfied that that case, and others I cite, will sustain the remedy by *mandamus*. *Cross* v. *Railway Co.*, 34 W. Va. 742 (12 S. E. Rep. 765) *Id.* 35 W. Va. 174 (12 S. E. Rep. 1071); *Booker* v. *Young*, 12 Gratt. 303; *Dew* v. *Judges*, 3 Hen. & M. 1; Hutch. Treat. W. Va. § 1278; *Lewis* v. *Whittle*, 77 Va. 415. I would affirm the judgment.