J. L. THOMAS, Movant,

v.

W. E. (Bill) LYONS, Respondent.

Supreme Court of Kentucky.

Sept. 11, 1979.

William C. Jacobs, Lexington, for movant.

Richard E. Vimont, Timothy C. Wills, Vimont & Clay, Lexington, for respondent.

PALMORE, Chief Justice.

This is a proceeding in which the movant, J. L. Thomas, a candidate for nomination to the office of councilman for the 8th District of the Lexington-Fayette Urban County Government, sought to prevent the names of respondent, W. E. (Bill) Lyons, and Jacob R. Asher[1] from appearing on the ballot as candidates for the same office in the May, 1979, primary election.

The action was brought in the form of a motion under KRS 118.176, a statute providing a summary procedure for challenging the good faith of a candidate "seeking party nomination or election as an independent," etc. Thomas prevailed in the Fayette Circuit Court, but the Court of Appeals reversed on the ground that KRS 118.176 does not apply. Despite a provision of KRS 118.176(4) that "the order of the Court of Appeals or judgment thereof shall be final," this court treated Thomas's petition for relief under CR 76.36 as a motion for discretionary review and granted it.

The Lexington-Fayette Urban County Government is a governmental unit unlike any other in this state. It is governed largely by the provisions of its voter-approved comprehensive plan styled a "Charter." See KRS 67A.010 et seq.; *Pinchback v. Stephens*, Ky., 484 S.W.2d 327 (1974); *Holsclaw v. Stephens*, Ky., 507 S.W.2d 462 (1974). Its powers and responsibilities are measured by those of the county or city of the highest class existing within the county at the time of the governmental reorganization. KRS 67A.060. Article 12.05 of the Charter provides that all election laws of the Commonwealth shall be applicable to the merged-government elections except as expressly provided to the contrary by the Charter.

The legislative powers of the urban county government are vested in an urban-county council of 15 members elected by the public on a nonpartisan basis. Article 12.02 of the Charter provides that the procedures for securing nomination to the council at a primary election shall be those set forth in KRS 89.440, except that no primary shall be held for a position for which there are no more than two applicants.

KRS 89.440 deals with primary elections in cities operating under the city-manager form of government. Lexington, before its governmental merger with Fayette County, was a city of the second class operating under the city-manager form of government. Insofar as they differ from cities operating under other forms of government, city-manager cities are governed by KRS 89.390–89.680, one of which statutes, KRS 89.400, provides that all laws otherwise applicable to cities of the second, third and fourth classes and not inconsistent with this series of city-manager statutes shall continue to apply to city-manager cities. Hence the Lexington-Fayette Urban County Government is subject to and has the benefit of all the laws that are applicable to cities of the second class unless they are inconsistent with KRS 89.390–89.680.

In accordance with KRS 89.440 and Article 4.04 of the Charter, urban-county council members are nominated through a nonpartisan primary designed to reduce the number of candidates on the November ballot to two for each office. To be eligible for nomination in a city of the second class, the applicant "shall, at least fifty-five (55) days before the day of the primary election, file with the county clerk a petition signed

---

1. Asher did not contest the action in the trial court and is not a party to this review.

by at least one hundred (100) voters," and it is this requirement that Lyons and Asher, according to the findings of fact made by the trial judge, did not meet.[2]

There being no contention that the factual findings of the trial court were clearly erroneous, they are, of course, conclusive. CR 52.01. To put it another way, we begin with the conspicuous fact that Lyons did not comply with the eligibility requirements of the statute and was not a qualified applicant for nomination unless those requirements are invalid.

■ Lyons argues that the statutory requirement of 100 signatures violates the due process and equal protection clauses of the 14th Amendment, citing *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979), in which the Supreme Court of the United States invalidated, under the equal protection clause, a state statute requiring more signatures on a nominating petition for a local office than would have been required on a similar petition for nomination to a statewide office.[3] By analogy, he points out that in Kentucky an independent running in a partisan race for an office similar to that of an urban county council member needs only 20 signatures on his petition, cf. KRS 118.305(1)(e) and 118.315(2), and that a candidate for judicial office in the 14-county judicial district embracing Fayette County need have but two signatures on a petition for nomination, cf. KRS 118A.060–070.

The Illinois statute applied to persons who wished to run as independents and to new political parties desiring to nominate candidates. The controversy arose and was decided in the context of partisan elections. That is, the burden of securing a large number of signatures was placed upon persons and organizations choosing to enter the field against established political parties and their candidates. We point this out because it is clear that the historic importance of new parties in the American political scheme, the free access of the public to their ideas, and vice versa, were substantial factors in the conclusion reached by the Supreme Court of the United States. In simple terms, this was a statute making it difficult for new voices and "outsiders" to gain a foothold in the market-place against the monopoly of an entrenched establishment. Hence the vital issue in that case was different from the constitutional issue raised in this case, in which no political parties are involved, there are neither insiders nor outsiders, and each candidate has the same burden as every other candidate.

We confess that in attempting to draw from the majority opinion in the *Illinois State Board* case an articulable rationale for application to other cases we encounter the same difficulty expressed in Mr. Justice Blackmun's concurring opinion, 440 U.S. at 188, 99 S.Ct. at 992. Superficially, the court appears to have held the statute invalid because more signatures were required for local elections than for statewide elections. The only logical connection we are able to discern, however, between the local requirement and the statewide requirement is that the contrast illuminated the unreasonableness of the local requirement.

It seems to us that in order to determine whether a person is being denied equal protection of the laws it is necessary to make a comparison between two people or classes of people in relation to their respective enjoyment of the same privilege or protection. This, of course, necessitates identifying those who sit on the other side of the scales and what privilege or protection they are said to be enjoying that is denied to the complaining party. In the Illinois case, was it the potential outsider who wanted to make a statewide race, and had a lower

---

**2.** For reasons not here pertinent, the trial court struck 12 of the 102 names signed on the Lyons application.

**3.** In a local election the minimum requirement was a number equal to 5% of the number of votes cast at the previous election, which in the instance of Chicago amounted to 35,947 signatures. In contrast, for a statewide election the requisite number of signatures was 25,000.

hurdle to clear than his local counterpart in Chicago? Surely not. Logically, it had to be the established political parties and their candidates for election to local office, because they were the people who had ready access to an election process that was denied to any other person or party except through a petition bearing 35,947 signatures. In terms of equal protection, the difference between the unaffiliated would-be candidate or new party and the established parties and their candidates was not sufficient to justify such a disparity in their respective opportunities of access to the ballot. That the requirement for a statewide election was only 25,000 signatures certainly had much evidentiary significance bearing on the question of whether the more burdensome requirement for a local election was necessary or reasonable, but we cannot see how the statutory requirements for a statewide election can be treated as a maximum that cannot be exceeded for a local election without violation of the equal protection clause. That one must pay $1.00 per bag for oranges whereas another can buy apples for 10¢ per bag does not raise an equal protection problem.

To bring this phase of the matter to a close, we do not believe that the Supreme Court of the United States would apply its ruling in the *Illinois State Board* case to a nonpartisan primary election in which the signature requirements for all candidates are the same. Persons desiring to run in a regular election as independent candidates against assorted party-nominated and other candidates are not "similarly situated" with persons seeking nomination in a nonpartisan primary election, nor are candidates for judicial office, who must, of course, meet certain qualifications beyond mere residence and supporting signatures.

The record before us does not include the evidence heard by the trial court. Hence we do not know what it disclosed with respect to the population of the districts from which urban-county council-members are elected. There is, however, no contention that the requirement of 100 signatures is or would be an unduly burdensome obstacle in any district. If it were, its ultimate effect on the elective process probably would run afoul of our own constitutional guaranty of free elections, Const. Sec. 6. Short of that possibility, a statutory requirement that an independent candidate produce evidence of a "significant modicum of support" in the form of a minimum number of voter-signatures in order to have his name placed on the ballot is not unconstitutional. Cf. *American Party of Texas v. White*, 415 U.S. 767, 789–790, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974).

We come now to the real problem in the case, which is whether KRS 118.176 was an authorized vehicle for Thomas to employ in challenging the right of another candidate to run in the primary election. That issue was raised by Lyons in the trial court, and the basis of the decision of the Court of Appeals reversing the judgment of the trial court was that KRS 118.176 does not apply. It is here that we encounter the difficulty of determining whether statutes drafted for cities with different forms of government from the urban-county government are nevertheless applicable by virtue of KRS 67A.060 and Article 12.05 of the Charter.

As we have mentioned already, these provisions tie the urban-county government to the election laws applicable to cities of the second class operating under the city-manager form of government.

Lyons' argument that KRS 118.176 was not applicable to this primary election rests on an analysis of its wording and the history and wording of KRS 118.105(4), the latter of which provides, "This section does not apply . . . to candidates for mayor or commissioner in cities of the fourth class operating under the commission form of government and in cities of the second, third or fourth class operating under the city manager form of government."

KRS 118.176 was enacted in 1974 (Ch. 130, Sec. 107, Acts of 1974). As a part of the same enactment (Sec. 100), what had formerly been KRS 119.020 was transferred to KRS Ch. 118 and became KRS 118.105. As it had in KRS 119.020, paragraph (4) of KRS 118.105 began with the words, "This

*chapter* does not apply . . ." (Emphasis added.) The word "chapter" as it thus appeared was changed to "section" by Ch. 384, Sec. 25, Acts of 1978, which was an enactment of 584 sections making numerous technical corrections in the Kentucky Revised Statutes.

In *Thompson v. Kenton County Board of Election Commission,* Ky., 535 S.W.2d 68 (1976), an unsuccessful candidate for nomination to the office of city commissioner for Covington, a city of second class operating under the city-manager form of government, brought an action to invalidate the primary in which he had been defeated. Citing KRS 120.055, which provided for an election contest by a candidate for nomination at a primary held under KRS 118.015 to 118.035 and KRS 118.105 to 118.255, this court pointed out that KRS 118.105(4), as it then read, excepted city-manager cities of the second class from the applicability of the "chapter," hence there was no statutory authority for the contest of a primary election in such cities.

■ KRS 120.055 was later broadened (Ch. 199, Sec. 3, Acts of 1976) to include "any candidate for nomination to a city office at a primary election for which the statutes do not otherwise provide for determining contest elections" (sic), and Lyons contends that this, rather than KRS 118.-176, was the proper remedy for Thomas in this case. For one rather fundamental reason we are unable to agree. KRS 122.055 is an election-contest statute, and *Thompson* was an election-contest case. Properly speaking, an election cannot be "contested" before it is held. An "election contest" is a post-election proceeding. What we have in this case is not an election contest, but a pre-election proceeding challenging the right of a purported candidate to participate in a primary election. Neither KRS 120.055 nor the *Thompson* case is relevant.

■ When the events of this case occurred the word "chapter" as it appeared in KRS 118.105(4) had been changed to "sec-

tion." Counsel for Lyons makes a persuasive argument for the proposition that the word "section" as now contained in this paragraph really was intended to mean KRS 118.105 to 118.255, to which the Legislative Research Commission has assigned the heading "Primaries," whereas it has placed the remainder of Chapter 118 under the heading "Regular Elections." This very well may have been the reviser's intention, but we cannot and do not believe that such a misuse of a well-understood and much-used term of its own peculiar trade would flow from the pen of so expert a draftsman. If the word "section" had been intended to cover the series of sections suggested by Lyons, the customary way for LRC to do it would have been to use "KRS 118.105 to 118.255" instead of "section." It is our opinion that the word "section" as used in KRS 118.105(4) must be construed to mean "section," which denotes a single, numbered statute.

■ We have had more difficulty with the wording of KRS 118.176. At first impression the words "any candidate seeking party nomination or election as an independent" would appear to embrace two classes of candidates, (1) one seeking party nomination in a primary and (2) one seeking to be placed on the ballot in a regular election as an independent. This, of course, would completely exclude applicants for nomination in a nonpartisan primary, which, considering the number of cities in Kentucky that elect their governing officers through that process, would be a puzzling omission indeed. We conclude, rather, that in this particular context the expression "election as an independent" was intended to and should be construed as referring to primary elections, and the only "independents" who run in primary elections are those who run in nonpartisan primaries.[4] It follows that KRS 118.176 was applicable and available to Thomas in this instance.

4. That KRS 118.176 falls within the portion of KRS Ch. 118 entitled "Primaries" may lend a degree of support to this conclusion.

Lyons makes a further argument to the effect that the "substantial compliance" rule should be applied in his favor. To apply that principle to the number of signatures required would amount simply to an unauthorized amendment of the statute. We must respectfully decline the invitation.

One more point, though not argued, bears mention. To the extent that KRS 118.176(4) provides that the action of the Court of Appeals shall be final runs athwart Const. Sec. 110(2)(b), which authorizes the Supreme Court to exercise appellate jurisdiction as provided by its rules.

Lyons and Asher having been ineligible to run in the primary, the two remaining candidates are entitled to have their names placed on the ballot in the regular election. The judgment of the trial court may be amended to that effect.

The decision of the Court of Appeals is reversed and, subject to such amendment as is necessary in view of the transpiration of the primary election, the judgment of the trial court is affirmed.

All concur.