233 S.E.2d 419 (1977)
STATE ex rel. Janet PICCIRILLO
v.
The CITY OF FOLLANSBEE, a Municipal Corporation, et al.[*]
No. 13905.
Supreme Court of Appeals of West Virginia.
June 7, 1977.
*420 Leonard J. Tost, Weirton, for relator.
MILLER, Justice:
Petitioner, Janet Piccirillo, brings this original mandamus action against the City of Follansbee, its Council members and Clerk to compel the respondents to place her name on the ballot for the forthcoming municipal election. She had presented her petition and filing fee as a candidate for Council but was refused access to the ballot on the ground that she did not possess the requisite property qualification as required *421 by the Charter of Follansbee,[1] a requirement similar to the statutory provision, W.Va.Code, 8-5-7(c).[2]
It is not disputed that except for the failure to meet this property requirement, petitioner is fully qualified as a candidate for Council. She contends the property qualification violates her constitutional right of equal protection as it discriminates against those who do not have assessed property.
We are thus presented with a limited question of whether the State or a municipality may place a property restriction as a qualification for candidacy for the office of city council.
A closely related question involving a requirement that a councilman be a freeholder was before the Court in State ex rel. Thompson v. McAllister, 38 W.Va. 485, 18 S.E. 770 (1893). That case was decided primarily by construction of Article IV, Section 4 of the West Virginia Constitution.[3] The majority held that the constitutional provision that "No person, except citizens entitled to vote, shall be elected . . ." did not prohibit the Legislature from imposing additional qualifications on the right to hold office. It viewed the constitutional requirement as establishing a broad class of eligible persons from which the Legislature could further delineate, through additional requirements, those qualified to become candidates for office.
A vigorous dissent by Judge Brannon was predicated on the absence in the Constitution of any property qualification for voting[4] or holding office, and the enumeration of specific qualifications for voting and holding office in Article IV, Sections 1 and 4, compelled the conclusion that no further qualification could be implied. This construction was reinforced by the lack of any language in the Constitution giving the Legislature the right to impose additional qualifications.
McAllister has been cited in a number of election cases for the proposition that the Legislature may impose reasonable qualifications above the constitutional restrictions for candidates for public office.
In neither McAllister nor the cases following it has the equal protection argument *422 been advanced.[5] However, the United States Supreme Court has applied the equal protection standard embodied in the Fourteenth Amendment to invalidate a number of state voting and candidate qualification restrictions.
In Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), Georgia's requirement that a candidate for a local board of education be a freeholder was held to violate the Equal Protection Clause. The Court observed that two tests are utilized to determine whether a state classification violates the equal protection guarantee.
The first is the "traditional" test, in which the Court determines whether the challenged classification rests on grounds wholly irrelevant to the achievement of a valid state purpose, citing McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), and Kotch v. Board of River Port Pilot Commissioners, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1946). The alternative test requires the state to demonstrate a "compelling" interest in support of the challenged action or classification, citing Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), and Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969).
The Court held in Turner that under either test Georgia's freeholder requirement was unconstitutional.
This Court has in the past discussed the constitutional guarantee of equal protection found in Article III, Section 17 of the West Virginia Constitution. In Linger v. Jennings, 143 W.Va. 57, 99 S.E.2d 740 (1957), it was held that the equal protection guarantee required the furnishing of a free transcript to indigent defendants without counsel. In State ex rel. Payne v. Walden, W.Va., 190 S.E.2d 770 (1972), the State distress statute was held violative of equal protection. However, in neither Linger nor Payne was there any extensive discussion as to the test to be applied in utilizing West Virginia's equal protection guarantee.
This Court did consider and apply the Federal standard for equal protection under the Fourteenth Amendment to the United States Constitution in Cimino v. Board of Education of County of Marion, W.Va., 210 S.E.2d 485 (1974), in the following language:
"Whether a statute or governmental action violates the Equal Protection Clause is a determination made by the application of one of two constitutional tests. The more demanding test relates to statutes which impinge upon sensitive and fundamental rights and constitutional freedoms, such as religion and speech. In order to uphold such a statute, a reviewing court must find that a compelling state interest is served by the classification. Weber v. Aetna Casualty & Surety Company, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768; Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600.
"In all other instances, the constitutionality of a statute, challenged under the Equal Protection Clause, is subject to the traditional standard requiring that the state law be shown to bear some rational relationship to legitimate state purposes. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16. Under this test, the court must consider whether the classification is a rational one based on social, economic, historic or geographical factors; whether the classification bears a reasonable relationship to a proper governmental purpose; and whether all persons *423 within the classes established are treated equally." [210 S.E.2d at 490]
We adopt these standards in applying the Equal Protection Clause of the West Virginia Constitution. Article III, Section 17. In order to test the disputed action in the present case, a determination must first be made as to whether the right to become a candidate for office is a fundamental right, requiring the more demanding compelling interest test. If not so found, then the less strict rational basis test is applicable.
This Court recognized in Brewer v. Wilson, 151 W.Va. 113, 150 S.E.2d 592 (1966), that the right to become a candidate for election to public office is a valuable and fundamental right. There it was held that while the Legislature could prescribe qualifications for office, such qualifications "must be reasonable and not in conflict with any constitutional provision." Supra, 151 W.Va. at 121, 150 S.E.2d at 597. In Brewer, no equal protection argument was advanced and the Court upheld W.Va.Code, 3-5-4, requiring the same qualifications for candidates in a primary election for county commissioner as was required in a general election by Article VIII, Section 23 of the West Virginia Constitution.
In State ex rel. Maloney v. McCartney, W.Va., 223 S.E. 607 (1976), both the majority and the minority recognized that the right to become a candidate for office is a fundamental right, entitled to constitutional protection under the Equal Protection Clause and federal First Amendment concepts of freedom of association and expression.[6] These federal constitutional rights are paralleled in Article III, Sections 7, 16 and 17 of the West Virginia Constitution. Other courts have also concluded that the right to run for office is a fundamental right. Mancuso v. Taft, 476 F.2d 187 (1st Cir. 1973); Thompson v. Mellon, 9 Cal.3d 96, 107 Cal.Rptr. 20, 507 P.2d 628 (1973); Gangemi v. Rosengard, 44 N.J. 166, 207 A.2d 665 (1965).
Once determined that the right to run for office is a fundamental right, the test is whether the challenge restriction serves a compelling state interest. In Maloney, supra, the Court concluded that limitations on tenure in the office of Governor serve a sound and salutary benefit on the body politic by breaking control of entrenched political machines, thereby fostering a more competitive political system. This was a sufficiently compelling state purpose to justify the constitutionality of the Governor's Succession Amendment.[7]
We do not believe that a compelling state interest can be demonstrated in the property qualifications imposed in this case. The reasoning that motivated the Court in McAllister to uphold the freeholder requirement does not appear persuasive in today's society.[8] The ownership of property bears *424 no fixed relationship to honesty, integrity and intelligence, which are qualities one expects in public officials. Even if we were to grant that property ownership enhances official morality, the requirement in the present case is so minimal as to be irrelevant for that purpose.
The requirement, having little positive benefit to recommend it, carries several insidious consequences. First, it acts as a trap for the unwary who have failed to ensure that their property has been assessed and, in effect, prohibits them from holding office. Secondly, because the tax assessment procedures for real and personal property start on July 1 for the succeeding year, it is possible for a person to move into and be a resident of a municipality for 19 months and still not have property assessed in his name or have paid taxes thereon as required by the ordinance and the statute.[9]
Thus, it appears that the property qualification carries a further penalty of imposing a durational residency requirement by virtue of the time periods built into our property assessment laws. Durational qualifications for voters and candidates have also been attacked under equal protection standards.[10] We do not, however, reach the constitutionality of the implied durational qualification in this case, as we find that there is no compelling state interest in the property requirement as a candidate qualification for city council. It must, therefore, fall before our equal protection standard under Article III, Section 17 of the West Virginia Constitution.
Writ awarded.
NOTES
[*] Editor's Note: The decision in State v. Bragg, published in advance sheets at this citation (233 S.E.2d 419) was withdrawn from the bound volume because rehearing is pending.
[1] "Eligibility of Officers. Section 6. The Mayor and Councilmen, City Attorney, Chief of Police, City Clerk and City Collector and Treasurer, at the time of their election or appointment, shall be a legal voter of said city, and, for the preceding year, assessed with and paid taxes upon at least One Hundred Dollars ($100.00) worth of real or personal property in said city."
[2] "Unless otherwise provided by charter provision or ordinance, the mayor, recorder and councilmen must be residents of the municipality, must be qualified voters entitled to vote for members of its governing body, and for the year preceding their election must have been assessed with and paid real or personal property taxes to the municipality upon at least one hundred dollars' worth of property therein, except that the city manager in a manager form of government need only be a resident of the city at the time of his appointment: . . ."
[3] "No person, except citizens entitled to vote, shall be elected or appointed to any state, county or municipal office; but the governor and judges must have attained the age of thirty, and the attorney general and senators the age of twenty-five years, at the beginning of their respective terms of service; and must have been citizens of the State for five years next preceding their election or appointment, or be citizens at the time this Constitution goes into operation."
[4] Article IV, Section 1, West Virginia Constitution:

"The male citizens of the State shall be entitled to vote at all elections held within the counties in which they respectively reside; but no person who is a minor, or of unsound mind, or a pauper, or who is under conviction of treason, felony, or bribery in an election, or who has not been a resident of the State for one year, and of the county in which he offers to vote, for sixty days next preceding such offer, shall be permitted to vote while such disability continues; but no person in the military, naval or marine service of the United States shall be deemed a resident of this State by reason of being stationed therein."
[5] In State ex rel. Maloney v. McCartney, W.Va., 223 S.E.2d 607 (1976), which did not cite McAllister, an equal protection claim under the Fourteenth Amendment of the United States Constitution was asserted unsuccessfully against the provisions of Article VII, Section 4 of the West Virginia Constitution relating to the Governor's succession.
[6] While the constitutional guarantee of freedom of association and speech are not asserted in this case, it would appear that a test somewhat similar to the equal protection test would be applicable where their abridgment is claimed. Cousins v. Wigoda, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975); Communist Party of Indiana v. Whitcomb, 414 U.S. 441, 94 S.Ct. 656, 38 L.Ed.2d 635 (1974); Minielly v. State, 242 Or. 490, 411 P.2d 69 (1966).

There may be a moderating distinction as to both tests, where the claim involves the mechanics of voter or candidate registration. Compare Rosario v. Rockefeller, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) with Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973), which may be nothing more than stating that in this area of voter and candidate registration, the Court will be inclined to find a compelling state interest. Compare Lubin v. Panish, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974), with Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), and American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974).
[7] The minority in Maloney maintained no compelling state interest could be found and cited the lack of tenure restriction on judges and legislators, but these offices historically lack the political patronage and entrenched political machinery encountered in the office of Governor.
[8] "On the other hand, among those not owning real estate belong the floating population those who are too trifling and unthrifty to want property, and those who, having wasted their substance in riotous living, and spent their days in idleness are jealous of their neighbors' prosperity, and are ready to tear down, destroy, and scatter broadcast, the results of hard earnings, frugal management, and careful savings. To them, although electors, the prosperity and welfare of the municipality amounts to nothing, for, like the Bedouins of the plains, `neath the shadows of night they can fold their tents, and silently steal away, while, if there are any among the unfortunate but deserving poor who would make capable officers, their more successful neighbors are ever ready and willing to lend a helping hand, and see that they own the necessary `ten feet of ground.'" [38 W.Va. at 494-495, 18 S.E. at 773].
[9] W.Va.Code, 11-3-1, fixes the annual date of assessment of property as of July 1. W.Va. Code, 11-3-2, sets January 30 of the next year as the cutoff date for the assessor to complete the land and personal property tax. By W.Va. Code, 11-3-19, he delivers a copy of property books to the sheriff not later than June 7. Under W.Va.Code, 11A-1-6, the sheriff commences to collect taxes on July 15, and under W.Va.Code, 11A-1-3, taxes on real and personal property are payable in two installments, the first by September 1 of the year for which the assessment is made and the second installment on March 1 of the following year. Since the challenged restrictions require the candidate to "have assessed property and paid taxes thereon", for a person moving into a municipality after January 30, 1977, when the assessor's books close, the date of payment would be September, 1978, a period of 19 months before he would be eligible to file.
[10] Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Thompson v. Mellon, 9 Cal.3d 96, 107 Cal.Rptr. 20, 507 P.2d 628 (1973); Annot., 65 A.L.R.3d 1029 (1975). It is perhaps of some significance that the United States Supreme Court has affirmed without opinion several cases which have upheld durational requirements on statewide offices. Sununu v. Stark, 383 F.Supp. 1287 (D.N.H.1974), aff'd, 420 U.S. 958, 95 S.Ct. 1346, 43 L.Ed.2d 435 (1975) (State Senator); Kanapaux v. Ellisor, 419 U.S. 891, 95 S.Ct. 169, 42 L.Ed.2d 136 (1974) (Governor); Chimento v. Stark, 353 F.Supp. 1211 (D.N.H.1973), aff'd, 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973) (Governor).