WEST VIRGINIA LIBERTARIAN PARTY,

1980 WEST VIRGINIA SOCIALIST WORKERS

CAMPAIGN COMMITTEES, TOM MORIARTY,

*and* JOHN B. ANDERSON AS INTERVENOR,

*Petitioners*

*v.*

A. JAMES MANCHIN, *Secretary of State,*

*Respondent*

(No. 14863)

Decided September 16, 1980.

*Robert M. Bastress and Charles R. DiSalvo,* for petitioners.

*Ricklin Brown, Bowles, McDavid, Graff & Love, William R. Robertson, Elizabeth J. Keefer and Mitchell Rogovin,* for intervenor Anderson.

*Robert S. Baker* for amicus curiae.

*Chauncey H. Browning,* Attorney General, *Larry R. Frail,* Assistant Attorney General, for respondent.

MILLER, JUSTICE:

The petitioners in this original mandamus proceeding—the West Virginia Libertarian Party; the 1980 West

Virginia Socialist Workers Compaign Committee; Tom Moriarty, the Socialist Workers' gubernatorial candidate; and John B. Anderson—challenge the constitutionality of various provisions of the West Virginia Code which govern their access to the ballot for the 1980 general election.

The petitions were filed with this Court on April 30, 1980. On May 6, we granted a rule to show cause, making the return date for full argument May 20. Shortly before the date of full argument, petitioner John B. Anderson was permitted to intervene.[1]

Because the primary election of June 3, 1980, was imminent and third-party signature petitions had to be filed by June 2, we issued an order on May 22 in part granting and in part denying the requested relief, with an opinion to follow. This was in accordance with our prior practice where time considerations preclude the preparation of a full opinion. *See State ex rel. Bromelow v. Daniel*, 163 W.Va. 532, 258 S.E.2d 119 n. 1 (1979); *State ex rel. Brewer v. Wilson*, 151 W.Va. 113, 150 S.E.2d 592 (1966); *State ex rel. Cline v. Hatfield*, 145 W. Va. 611, 116 S.E.2d 703 (1960); *State ex rel. Duke v. O'Brien*, 145 W. Va. 600, 117 S.E.2d 353 (1960).

The challenges to our State election statutes are constitutional in nature. First, W. Va. Code 3-5-8(a), relating to filing fees, is claimed to be a violation of the Equal

---

[1] The Citizens Party, represented by the same counsel retained by the Libertarian Party, the Socialist Workers Campaign Committee, and candidate Moriarty, also filed a motion to intervene, which the Court did not grant. Because the motion of the Citizens Party stated, in paragraph 7, that their claims were "identical in law and in fact" to those raised in the petitions already filed, the Court deemed intervention unnecessary, since any judgment in petitioners' favor would inure to the benefit of the Citizens Party. As an independent candidate rather than a political party candidate, intervenor Anderson asserted different claims. The Court therefore adjudged his intervention to be justified. After the Court issued its order in part granting and in part denying relief, the Citizens Party appealed to the United States Supreme Court under the case caption of *Citizens Party v. Manchin*, No. 79-1989 (docketed June 17, 1980). *See* 49 U.S.L.W. 3001, 3002, 3850.

Protection Clauses of our State and Federal Constitutions because it denies ballot access to candidates unable to pay the filing fee. Second, W. Va. Code 3-5-23, is attacked because it purportedly denies the fundamental right of access to the ballot by an independent candidate not aligned with a political party. A third challenge is made to the same statute on the basis of its requirement that persons circulating nominating petitions must reside in the same magisterial district as persons who sign the petitions.

The fourth challenge is also directed against W. Va. Code, 3-5-23, and centers on its requirement that persons soliciting signatures on a nominating petition must first obtain a credentials certificate. Another complaint is lodged against the provision of this statute which disqualifies those persons signing a nominating petition from voting in the primary election. This complaint is coupled with the final claim relating to W. Va. Code 3-5-24, which sets the filing deadline for nominating petitions as the day before the primary election. Petitioners contend that these provisions, either separately or in their combined effect, constitute an undue burden on ballot access.

This Court has not had recent occasion to consider the West Virginia statutes relating to third-party candidates. In *Cunningham v. Cokely*, 79 W.Va. 60, 90 S.E. 546 (1916), we dealt with a forerunner to W. Va. Code 3-5-23, and found its requirement not to be an undue restriction on ballot access for a minor political party. There, the Prohibition Party had sought ballot access by way of a State nominating convention. Our then-existing statute did not permit this procedure for a minor political party which had not obtained 5% of the total vote for Congressman at the last general election. The Prohibition Party had not obtained this vote in the preceding general election. The statute, however, enabled third-party candidates to obtain ballot access through signature petitions representing 5% of the voters participating in the last election for the office sought, and we found this to be sufficient.

During the past ten years, the United States Supreme Court has entered the field of ballot access in a rather dramatic fashion, and it is its decisions, predicated on constitutional provisions made binding on the states, that we must apply.[2]

# I
## FILING FEES

The petitioner West Virginia Libertarian Party [WVLP] is attempting to sponsor Edward Clark for President, David Koch for Vice President, and Jack Kelly for Governor in the 1980 general election. The West Virginia Socialist Workers Campaign Committee [WVSWCC] is attempting to sponsor Andrew Pulley, Matilda Zimmerman and Tom Moriarty as its candidates for President, Vice President and Governor, respectively. All of these candidates assert they are unable to pay the filing fee for their respective office.

W. Va. Code, 3-5-8(a), mandates a filing fee for the offices of President, Vice President and Governor "equivalent to one percent of the annual salary of the office."[3] W. Va. Code, 3-5-23(a), regulating the petition procedure for the nomination of candidates by third parties, requires the candidate in advance of obtaining the petition

---

[2] A detailed discussion of the various principles involving ballot access may be found in the following commentaries: *e.g.,* J. Elder, *Access to the Ballot by Political Candidates,* 83 Dick. L. Rev. 387 (1979); Note, *Nominating Petition Requirements for Third-Party and Independent Candidate Ballot Access,* 11 Suff. U.L. Rev. 974 (1977); *Developments in the Law—Elections,* 88 Harv. L. Rev. 1111, 1114-1212 (1975); Kester, *Constitutional Restrictions on Political Parties,* 60 Va. L. Rev. 735 (1974); Note, *Primary Elections: The Real Party in Interest,* 27 Rutgers L. Rev. 298 (1974); Comment, *The Constitutionality of Qualifying Fees for Political Candidates,* 120 U. Pa. L. Rev. 109 (1971).

[3] The text of W. Va. Code, 3-5-8(a), states:

"A candidate for president of the United States, for vice-president of the United States, for United States senator, for member of the United States house of representatives, for governor and for all other state elective offices shall pay a fee equivalent to one percent of the annual salary of the office for which the candidate announces; ..."

signatures to file a declaration of his candidacy and "pay the filing fee required by law."[4] Thus, ballot access for all candidates is predicated on the payment of the filing fees under W. Va. Code, 3-5-8.

The United States Supreme Court in *Lubin v. Panish*, 415 U.S. 709, 39 L. Ed. 2d 702, 94 S.Ct. 1315 (1974), and *Bullock v. Carter*, 405 U.S. 134, 31 L. Ed. 2d 92, 92 S.Ct. 849 (1972), recognized that the requirement of a filing fee for placement on the ballot fulfills a legitimate state interest—that of deterring frivolous candidacies. Underlying this interest is the desire to limit the size of the ballot in order to avoid voter confusion and to further avoid the increased possibility of runoff elections.

*Lubin* and *Bullock* also acknowledged a countervailing interest that open access to the ballot plays a vital role in giving an opportunity to candidates and voters to espouse various political and social viewpoints—an essential part of the right of free expression guaranteed by the First Amendment. *See Williams v. Rhodes*, 393 U.S. 23, 21 L. Ed. 2d 24, 89 S.Ct. 5 (1968).

In an attempt to reconcile these competing interests, *Bullock* and *Lubin* determined that a state could not condition ballot access solely upon the payment of a filing fee. In *Bullock*, the Court invalidated filing fees as high as $9,000, which were later termed in *Lubin* as

---

[4] The text of W. Va. Code, 3-5-23(a), reads:

"Groups of citizens having no party organization may nominate candidates for public office otherwise than by conventions or primary elections. In such case, the candidate or candidates, jointly or severally, shall file a declaration containing the name of the political party he or they propose to represent, its platform, principles or purposes, with the secretary of state if the office is to be filled by the voters of more than one county, or with the clerk of the circuit court of the county if the office is to be filled by the voters of one county or political subdivision thereof; such declaration to be filed at least thirty days prior to the time of filing the certificate provided by section twenty-four [§ 3-5-24] of this article, and at the time of filing of such declaration each candidate shall pay the filing fee required by law, and if such declaration is not so filed or the filing fee so paid the certificate shall not be received by the secretary of state, or clerk of the court, as the case may be;"

"patently exclusionary." [415 U.S. at 715 n. 4, 39 L. Ed. 2d at 708, 94 S.Ct. at 1319]. *Bullock* involved a Texas statute that provided no reasonable alternative means of testing the strength of public support for a candidate. In *Lubin,* the Court struck down a California statute which required the payment of a much more modest sum—approximately $700—but nevertheless an amount the candidate could not pay. Significantly, the California statute also provided no alternative procedure for satisfying the legitimate state interest of gauging the depth of the candidate's public support. *Lubin* made clear that a petition requirement was such an alternative:

> "States may, for example, impose on minor political parties the precondition of demonstrating the existence of some reasonable quantum of voter support by requiring such parties to file petitions for a place on the ballot signed by a percentage of those who voted in a prior election. See American Party of Texas v. White, 415 US, p 767, 39 L Ed 2d 744, 94 S.Ct 1296. Similarly, a candidate who establishes that he cannot pay the filing fee required for a place on the primary ballot may be required to demonstrate the 'seriousness' of his candidacy by persuading a substantial number of voters to sign a petition in his behalf. The point, of course, is that ballot access must be genuinely open to all, subject to reasonable requirements. *Jenness v. Fortson,* 403 US 431, 439, 29 L Ed 2d 554, 91 S Ct 1970 (1971)." [415 U.S. at 718-19, 39 L. Ed. 2d at 710, 94 S.Ct. at 1321].

We addressed a related issue in *State ex rel. Piccirillo v. City of Follansbee,* 160 W.Va. 329, 233 S.E.2d 419 (1977), and determined that the right to file for public office is a fundamental right under our Equal Protection Clause, Article III, Section 17 of the West Virginia Constitution, and that a statute imposing a $100 property ownership requirement on candidates was unconstitutional. However, *Bullock, Lubin* and *Piccirillo* cannot be read to abrogate all filing fee requirements. Their teaching is that as to those candidates who cannot pay the filing fee, some alternative mode of gaining access to the

ballot must be provided, such as petitions containing voter signatures.

Under W. Va. Code, 3-5-8, there is no mechanism for ballot access except the payment of the filing fee. In light of the Equal Protection Clause principles set out in *Bullock* and *Lubin,* we conclude that the failure to provide a reasonable alternative to filing fees for impecunious candidates to obtain access to the ballot renders the filing fee requirement of W. Va. Code, 3-5-8, unconstitutional as to such candidates. The State may not require, therefore, the payment of the filing fee by the candidates of the WVLP and WVSWCC.[5]

## II
## RESTRICTION OF BALLOT TO
## CANDIDATES OF POLITICAL PARTIES

Intervenor John B. Anderson complains that W. Va. Code, 3-5-23, precludes an independent candidate from seeking petition signatures in order to have his name placed on the ballot. This disability arises from the statute's requirement that the candidate's declaration of candidacy must contain "the name of the political party he ... propose[s] to represent, its platform, principles or purposes." [§3-5-23(a)].

In *Storer v. Brown,* 415 U.S. 724, 39 L. Ed. 2d 714, 94 S.Ct. 1274 (1974), the Supreme Court held that ballot access may not be limited to candidates of political parties, but must be extended to independent candidates as well:

> "[T]he political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other. A new party organization contemplates a statewide, ongoing organization with distinctive political character. Its goal is typically to gain control of the machinery of state government by electing its candidates to public of-

---

[5] Intervenor Anderson does not seek relief on this ground. At the time of filing his declaration of candidacy, he paid the filing fee.

fice. From the standpoint of a potential supporter, affiliation with the new party would mean giving up his ties with another party or sacrificing his own independent status, even though his possible interest in the new party centers around a particular candidate for a particular office. For the candidate himself, it would mean undertaking the serious responsibilities of qualified party status, under [state] law, such as the conduct of a primary, holding party conventions, and the promulgation of party platforms. But more fundamentally, the candidate, who is by definition an independent and desires to remain one, must now consider himself a party man, surrendering his independent status. Must he necessarily choose the political party route if he wants to appear on the ballot in the general election? We think not." [415 U.S. at 745-46, 39 L. Ed. 2d at 732, 94 S.Ct. at 1286].

See *McCarthy v. Briscoe*, 429 U.S. 1317, 50 L. Ed. 2d 49, 97 S.Ct. 10 (1976) (Powell, J., in chambers).

There seems to be little doubt that under *Storer*, W. Va. Code, 3-5-23, is constitutionally infirm in its failure to permit an independent candidate without political party affiliation to seek petition signatures.

We, therefore, hold that W. Va. Code, 3-5-23, violates the Equal Protection Clause of both the United States and the West Virginia Constitutions to the extent that it fails to extend to the independent candidate the same right to ballot access as that of the political party candidate.[6]

### III
### MAGISTERIAL DISTRICT RESTRICTIONS

The provisions of W. Va. Code, 3-5-23(b) and (c) under attack in this case relate to the requirement that the

---

[6] Under the 1915 Acts of the Legislature, Chapter 26, Section 23, which was an earlier version of W. Va. Code, 3-5-23, independent candidates apparently had the right to ballot access through signature petitions. See *George v. Board of Ballot Commissioners*, 79 W.Va. 213, 90 S.E. 550 (1916).

person soliciting signatures on the candidate's petition must do so within the magisterial district in which he resides and that only voters residing in that same magisterial district may sign the petition.[7]

The majority of the United States Supreme Court decisions that relate to this question involved state statutes imposing some type of voter distribution requirement. These laws generally required the candidate to obtain a minimum number of signatures from specified political subdivisions of the state. Ordinarily, an attack was made under equal protection principles with the third party or independent candidate claiming that the requirement created a burden not supported by any compelling state interest. *E.g., Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 59 L. Ed. 2d 230, 99 S.Ct. 983 (1979); *Moore v. Ogilvie,* 394 U.S. 814, 23 L. Ed. 2d 1, 89 S.Ct. 1493 (1969); *Communist Party of Illinois v. State Board of Elections,* 518 F.2d 517 (7th Cir. 1975), *cert. denied,* 423 U.S. 986, 46 L. Ed. 2d 303, 96 S.Ct. 394.

The above cases dealt with various Illinois election statutes. In *Moore,* the Court struck down the requirement that a third party candidate for statewide office obtain petition signatures of at least 200 qualified voters in each of at least fifty of the state's counties. *Socialist Workers Party* involved a requirement that third-party candidates in Chicago obtain petition signatures equal to 5% of the number of persons voting in the last election, or approximately 36,000 signatures, while by con-

---

[7] The material portion of W. Va. Code, 3-5-23(b), provides:

"The person or persons soliciting or canvassing signatures of duly qualified voters on such certificate or certificates, shall be residents and qualified, registered voters, of the magisterial district of the county in which such solicitation or canvassing is made, and may solicit or canvass duly registered voters resident within their own respective magisterial district . . . ."

The relevant part of W. Va. Code, 3-5-23(c), states:

"The certificate shall be personally signed by duly registered voters . . . who must be residents within the magisterial district of the county wherein such canvass or solicitation is made by the person or persons duly authorized."

trast, candidates for statewide office had to secure only 25,000 signatures. This disparity was held to be violative of equal protection principles because the state could not show any compelling interest for requiring a candidate for city office to obtain a higher number of signatures than a statewide candidate. *Communist Party of Illinois* overturned a requirement that not more than 13,000 of the 25,000 signatures could be obtained in a single county.

In the wake of *Moore v. Ogilvie, supra,* lower federal courts have invalidated a number of voter distribution requirements for candidate nominating petitions. *See Communist Party of Illinois, supra; McCarthy v. Garrahy,* 460 F. Supp. 1042 (D.R.I 1978); *Communist Party of Illinois v. Ogilvie,* 357 F. Supp. 105 (N.D. Ill. 1972) (three-judge court); *Baird v. Davoren,* 346 F. Supp. 515 (D. Mass. 1972) (three-judge court); *Socialist Labor Party v. Rhodes,* 318 F. Supp. 1262 (S.D. Ohio 1970) (three-judge court), *aff'd mem., sub nom. Sweetenham v. Gilligan,* 409 U.S. 942, 34 L. Ed. 2d 214, 93 S.Ct. 282 (1972); *Socialist Workers Party v. Rockefeller,* 314 F. Supp. 984 (S.D. N.Y. 1970) (three-judge court), *aff'd mem.,* 400 U.S. 806, 27 L. Ed. 2d 38, 91 S.Ct. 65; *Socialist Workers Party v. Hare,* 304 F. Supp. 534 (E.D. Mich. 1969).

On the other hand, a few decisions have upheld voter distribution requirements. *See Udall v. Bowen,* 419 F. Supp. 746 (S.D. Ind. 1976) (three-judge court), *aff'd mem.,* 425 U.S. 947, 48 L. Ed. 2d 191, 96 S.Ct. 1720; *Zautra v. Miller,* 348 F. Supp. 847 (D. Utah 1972) (three-judge court); *Moritt v. Governor of New York,* 42 N.Y.2d 347, 397 N.Y.S.2d 929, 366 N.E.2d 1285 (1977), *appeal dismissed,* 434 U.S. 1029, 54 L. Ed. 2d 777, 98 S.Ct. 758 (1978). In *Udall* and *Moritt,* the distribution provision required a certain number of signatures from substantially equal congressional districts.[8] One difficulty with

---

[8] In *Zautra v. Miller,* 348 F. Supp. 847 (D. Utah 1972), the court upheld a dispersal requirement of ten signatures in each of 29 counties as not significantly burdensome. *Zautra* has been criticized for failing to apply the one-man, one-vote analysis of *Moore v. Ogilvie,* 394 U.S. 514, 23 L. Ed. 2d 1, 89 S.Ct. 1493 (1969). *See*

any geographic distribution requirement is that it discriminates against candidates who represent geographically concentrated constituents, giving an effective veto of ballot access to an insular minority. *See, e.g., McCarthy v. Garrahy, supra,* 460 F. Supp. at 1047-48; L. Tribe, *American Constitutional Law* § 13-20 (1978), at 781 n. 22. In our view, the magisterial district restriction in the present case is significantly more onerous than the congressional district restrictions upheld in *Udall* and *Moritt.* Our magisterial districts are small components of our counties, which in turn form our congressional districts. Moreover, the magisterial restriction on canvassers severely inhibits their geographic mobility.

A possible State justification for the magisterial restriction contained in W. Va. Code, 3-5-23(b) and (c), is that the signature solicitor would be familiar with the voters of his magisterial district and they, in turn, would have more confidence in him than in a stranger. However, the solicitor is "certified," as we discuss in greater detail in the next section of this opinion, so that his credentials should allay any fear on the part of the voter as to his bona fides. It is doubtful whether even the solicitor residing in the magisterial district would have knowledge that a voter was qualified under our elections statute, and therefore he would rely on the voter's assertion that he was.

Substantial burdens are imposed on a third-party or independent candidate by the magisterial district restriction. The magisterial district is generally a small geographic unit and the candidate, with his solicitors localized in their own magisterial districts, is forced into a relatively immobile signature petition campaign. Since he is compelled to recruit solicitors for each magisterial district, the candidate is further hampered by a fragmented signature drive and increased costs. The restriction also hampers his solicitation in locations where citi-

*McCarthy v. Garrahy,* 460 F. Supp. 1042, 1048 n. 7 (D. R.I. 1978); *Developments in the Law—Elections,* 88 Harv. L. Rev. 1111, 1150 n. 163 (1975).

zens tend to congregate in large numbers, such as downtown areas, shopping centers, public parks and theaters, since persons congregating in those areas are rarely residents of the magisterial district in which the area or facility is located.

Finally, since the boundaries of magisterial districts are difficult to ascertain and, consequently, neither the voter nor the solicitor may be aware of the location of the boundary lines,[9] invalid signatures may appear on the petition, further hampering the nominating drive.

In the face of these substantial burdens imposed by the magisterial district requirement, which has no counterpart with respect to regular party candidates, the State's attempt to show a compelling interest must fail.

We, therefore, conclude that the magisterial district restriction found in W. Va. *Code*, 3-5-23(b) and (c), cannot be justified by a compelling State interest under the Equal Protection Clauses of the State and Federal Constitutions.

## IV
## THE CREDENTIALS REQUIREMENT

Included within W. Va. Code, 3-5-23(b), is the requirement that a solicitor of petition signatures must "first obtain from the clerk of the county court of which such canvasser or solicitor is a resident, credentials which must be exhibited to each voter canvassed or solicited." The section further provides that "upon proper application made as herein provided," the county clerk "shall issue such credentials and shall keep a record thereof."

Relying primarily on *Hynes v. Mayor of Oradell*, 425 U.S. 610, 48 L. Ed. 2d 243, 96 S.Ct. 1755 (1976), the WVLP, the WVSWCC and Moriarty claim that this Code requirement violates the First Amendment to the United

---

[9] W. Va. Code, 7-2-2, does not mandate a field survey and plat of magisterial district boundaries. This section permits the county commission to periodically adjust magisterial districts upon general publication notice to the residents of the district. *See County Court v. Bailey*, 97 W. Va. 351, 125 S.E. 253 (1924).

States Constitution. In *Hynes*, the Court invalidated a New Jersey ordinance which required, in material part, that a solicitor for a "Federal, State, County or Municipal political campaign or cause" notify the local police department in advance "for identification only." Disturbed by the breadth of the terms "cause" and "identification," the Court held the ordinance impermissibly vague under the First Amendment. It is significant, however, that the *Hynes* Court conceded that the meaning of the phrase "political campaign" was "fairly clear." [425 U.S. at 621, 48 L. Ed. 2d at 253, 96 S.Ct. at 1761].

W. Va. Code 3-5-23(b), is reasonably explicit as to the nature of the required credentials. It states that they "may be in the following form or effect:"

> "State of West Virginia, County of _____, ss: This certifies that _____, a duly registered voter of Precinct No. _____, _____ District, of this county and State;[10] whose post-office address is _____, is hereby authorized to solicit and canvass duly registered voters [residing in _____ District of this county][11] to sign a certificate purporting to nominate _____ (here place name of candidate heading list on certificate) for the office of _____ and others, [to represent the _____ Party][12] at the general election to be held on _____, 19 _____.
>
> "Given under my hand and the seal of my office this _____ day of _____, 19. _____.
>
> Clerk, County Court
> of _____ County."

The foregoing statutory credentials form, as modified by brackets to conform to our earlier holdings in the

[10] None of the petitioners raised the issue of whether out-of-State solicitors could canvass for signatures. We, therefore, do not reach this question.

[11] By virtue of our holding in Part III of this opinion with respect to the magisterial district restriction, this bracketed language would be rendered inoperative.

[12] As a result of our holding in Part II of this opinion as to the necessity of filing as a party candidate, this bracketed language would be rendered invalid.

present case, clearly defines and limits the information that can be obtained by the official issuing the credentials. The official is entitled to be informed of the solicitor's name, post office address, precinct number and magisterial district, and the candidate's name and the office which he seeks. These are all pertinent facts narrowly confined to the actual mechanics of the petition procedure. There is no vagueness in terminology such as influenced the Court in *Hynes, supra.*

*Hynes,* and those decisions it cited, recognized that the First Amendment does not preclude a state from enacting a suitable statute:

"[To] protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent. [425 U.S. at 618-19, 48 L. Ed. 2d at 252, 96 S.Ct. at 1759-60; *quoting from Cantwell v. Connecticut,* 310 U.S. 296, 306, 84 L. Ed. 1213, 1219, 60 S.Ct. 900, 904 (1940)].[13]

Here, the credentials requirement, a form of registration, serves a substantial State interest in assuring the integrity of the signature solicitation process. It prevents or reduces the opportunity for the bogus solicitor, promoted by adversary candidates, to reduce the pool of potential petition signers in a fraudulent petition drive, or to misrepresent himself as the candidate's supporter and then abuse the electorate by alienating them from the candidate's legitimate solicitors. *See generally Berger v. Acito,* 457 F. Supp. 296, 300 (S.D. N.Y. 1978);

---

[13] Also quoted with approval in *Hynes v. Mayor of Oradell,* 425 U.S. 610, 619, 48 L. Ed. 2d 243, 252, 96 S. Ct. 1755, 1760 (1976), was the following statement from Professor Zechariah Chafee's book, *Free Speech in the United States* 406 (1954):

"Of all the methods of spreading unpopular ideas, [house-to-house canvassing] seems the least entitled to extensive protection. The possibilities of persuasion are slight compared with the certainties of annoyance. Great as is the value of exposing citizens to novel views, home is one place where a man ought to be able to shut himself up in his own ideas if he desires."

Note, *Nominating Petition Requirements for Third-Party and Independent Candidate Ballot Access*, 11 Suff. U. L. Rev. 974, 1010-1011 (1977). The utilization of such "dirty tricks" is not unknown to our campaign practices. *See* C. Bernstein & B. Woodward, *All the President's Men* 112-130 (1974).

We, therefore, conclude that the credentials requirement set out in W. Va. Code, 3-5-23, and as modified by our earlier holdings in this opinion, places no unconstitutional burden on independent or third-party candidates. It is narrow in the scope of the information required and does not contain vague terms which would permit the issuing official to do more than routinely issue the credentials.

# V
## DISQUALIFICATION FROM VOTING IN THE PRIMARY AND EARLY FILING DATE

W. Va. Code, 3-5-23(c), prohibits a person who signs a third-party or independent candidate's petition certificate from voting in the primary election.[14] W. Va. Code, 3-5-24, requires that the candidate must file his signature petitions no later than the day preceding the primary election.[15] The petitioners herein urge that the combined effect of these two requirements is to create

---

[14] The relevant portion of W. Va. Code, 3-5-23(c), reads:

"No person signing such certificate shall vote at any primary election to be held to nominate candidates for office to be voted for at the election to be held next after the date of signing such certificate; . . ."

[15] W. Va. Code, 3-5-24, states:

"All certificates nominating candidates for office under the preceding section [§ 3-5-23], including a candidate for the office of presidential elector, shall be filed, in the case of a candidate to be voted for by the voters of the entire State or by any subdivision thereof other than a single county, with the secretary of state, and in the case of all candidates for county and magisterial district offices, including all offices to be filled by the voters of a single county, with the clerk of the circuit court of the county, not later than the day preceding the date on which the primary election is held. After such date no such certificate shall be received by such officers."

an unconstitutional burden on petitioners' attempt to solicit petitions and thereby gain ballot access. We disagree.

It must be kept in mind that these two Code provisions constitute a method for third-party or independent candidates to gain access to the general election ballot,[16] as such candidates are not required to engage in the normal primary process as are the two major-party candidates. It is also clear, at least as to the voters in the ranks of third parties, that the petition process serves as the functional equivalent of a primary election.

In any analysis of an alleged equal protection violation in an election context, the task is to determine whether the state has imposed a significantly higher burden on the independent or third-party candidate than it has imposed on major-party candidates. *See Williams v. Rhodes*, 393 U.S. 23, 30, 31, 21 L. Ed. 2d 24, 31-32, 89 S. Ct. 5, (1968); *Thomas v. Lyons*, 586 S.W.2d 711, 713-14 (Ky. 1979). Even though there are constitutional limitations on state statutes governing elections, the United States Supreme Court recognized, in *Storer v. Brown*, 415 U.S. 724, 729-30, 39 L. Ed. 2d 714, 723, 94 S.Ct. 1274, 1279 (1974), that:

> "It has never been suggested that [our decisions] automatically [invalidate] every substantial restriction on the right to vote or to associate. Nor

---

[16] Under W. Va. Code, 3-5-22, third-party candidates may avoid the signature petition process by undertaking a convention if its party polled less than ten percent of the total vote cast for governor at the last general election. The statute in its entirety reads:

"Any political party which polled less than ten percent of the total vote cast only for governor at the general election immediately preceding may nominate candidates and select committees by party conventions, provided such nominations are made and the certificates thereof filed within the time and in the manner provided in section twenty-four [§ 3-5-24] of this article, or by certificate in the same manner as groups of citizens may make nominations as provided in the following section [§ 3-5-23].

"No delegate or person participating in the selection of delegates under this section shall vote in any primary election held in that year."

could this be the case under our Constitution where the States are given the initial task of determining the qualifications of voters who will elect members of Congress. Art. I, § 2, cl. 1. Also Art. 1, § 4, cl. 1, authorizes the States to prescribe '[t]he Times, Places and Manner of holding Elections for Senators and Representatives.' Moreover, as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes. * * *"

*Storer* involved a California statute which required independent candidates for Congress, *inter alia,* to have been disaffiliated from any political party for a one-year period immediately preceding the primary election and also not to have voted in the immediately preceding primary. It was claimed that these restrictions were an undue burden, since the independent candidate had to anticipate his candidacy at least twelve months prior to the primary, and possibly two years, if he had voted in the immediately preceding primary.

In upholding these provisions, *Storer* observed that:

"Otherwise, the qualifications required of the independent candidate are very similar to, or identical with, those imposed on party candidates. Section 6401 (Supp. 1974) imposes a flat disqualification upon any candidate seeking to run in a party primary if he has been 'registered as affiliated with a political party other than that political party the nomination of which he seeks within 12 months immediately prior to the filing of the declaration.' . . ." [415 U.S. at 733, 39 L. Ed. 2d at 725, 94 S.Ct. at 1280].

The Court also relied on the earlier case of *Rosario v. Rockefeller,* 410 U.S. 752, 36 L. Ed. 2d 1, 93 S.Ct. 1245 (1973), where a New York statute imposed an eleven-month waiting period for voters who wanted to change their party affiliation. This provision was found not to

be unconstitutional, as it served the valid state interest of protecting against interparty raiding.

The parallel between disaffiliation time periods for third-party or independent candidates and the time limitations for filing their signature petitions rests in the fact that in each instance, the candidate is forced to make an early decision on whether to assume third-party or independent status. This parallel was made even more explicit in *Mandel v. Bradley*, 432 U.S. 173, 53 L. Ed. 2d 199, 97 S.Ct. 2238 (1977), where the Court reversed a three-judge district court order declaring unconstitutional a Maryland statute which required independent candidates to file their signature petitions 230 to 240 days before the general election. While the Court in *Mandel* declined to make an extended analysis of the issue because of the lack of sufficient facts, it did observe that the district court:

> "[D]id not sift through the conflicting evidence and make findings of fact as to the difficulty of obtaining signatures in time to meet the early filing deadline. It did not consider the extent to which other features of the Maryland electoral system—such as the unlimited period during which signatures may be collected, or the unrestricted pool of potential petition signers—moderate whatever burden the deadline creates. See Developments in the Law—Elections, 88 Harv L Rev 1111, 1142-1143 (1975). It did not analyze what the past experience of independent candidates for statewide office might indicate about the burden imposed on those seeking ballot access. Instead, the District Court's assumption that the filing deadline by itself was *per se* illegal—as well as the expedited basis upon which the case necessarily was decided—resulted in a failure to apply the constitutional standards announced in Storer to the statutory provisions here at issue."[17] [432 U.S. at 178, 53 L. Ed. 2d at 206, 97 S.Ct. at 2241].

[17] Justice Stevens, the only dissenter in *Mandel*, would have held the statute unconstitutional because of its discriminatory treatment of independent candidates:

In *Jenness v. Fortson*, 403 U.S. 431, 29 L. Ed. 2d 554, 91 S.Ct. 1970 (1971), the Court was not troubled by Georgia's election law that gave third-party and independent candidates 180 days to obtain signature petitions and required that such petitions be filed by the same deadline—in June—that a regular party candidate filing in a primary must meet. *See Rock v. Bryant*, 459 F. Supp. 64 (E.D. Ark.), *aff'd*, 590 F.2d 340 (8th Cir. 1978); *LaRouche v. Guzzi*, 417 F. Supp. 444 (D. Mass. 1976).[18]

There are no limitations under W. Va. Code, 3-5-23, as to when a third-party or independent candidate may begin his signature petition drive. The only stricture is that the candidate's petitions must be filed the day preceding the primary election. Under W. Va. Code, 3-5-7, a regular-party candidate must file his certificate of candidacy no later than "the last Saturday of March next preceding the primary election day."

Petitioners argue that our filing deadline under W. Va. Code, 3-5-24, must be deemed burdensome in light of the "second chance" provision of the Texas statute considered in *American Party of Texas v. White*, 415 U.S. 767, 39 L. Ed. 2d 744, 94 S.Ct. 1296 (1974). However, we do not believe this case to be analogous, since the second chance statute applied only to third-party candidates who had failed to obtain the requisite voters in a rather complicated precinct convention system as outlined in

---

"In my judgment the Maryland statute unfairly discriminates against independent candidates in one respect. It requires the independent to make his decision to become a candidate much sooner than a member of a national political party.

"A party member is merely required to file a certificate of candidacy 70 days before the primary election. That procedure is so simple that he may postpone his decision until that very day and still satisfy all legal requirements for candidacy." [432 U.S. at 180-81, 53 L. Ed. 2d at 207, 97 S.Ct. at 2242-43].

[18] For decisions invalidating filing deadlines that were substantially earlier for independent candidates than for primary candidates, see *McCarthy v. Noel*, 420 F. Supp. 799 (D. R.I. 1976); *McCarthy v. Kirkpatrick*, 420 F. Supp. 366 (W.D. Mo. 1976); *cf. MacBride v. Exon*, 558 F.2d 443 (8th Cir. 1977).

Note 6 of *American Party of Texas* [415 U.S. at 774, 39 L. Ed. 2d at 756, 94 S.Ct. at 1303].

Even under the second chance provision, the Texas procedure foreclosed signatures of those voters who had voted in the regular primary. We cannot help but believe that our straightforward signature petition standard is much less burdensome than the Texas precinct convention and second chance scheme.

Our provision is closely analogous to the Texas independent candidate petition statute, set out in Note 7 of *American Party of Texas, supra.* The Supreme Court characterized the attack on this statute in this fashion: "[T]he argument that the statute is unduly burdensome approaches the frivolous." [415 U.S. at 759, 39 L.Ed. 2d at 764, 94 S.Ct. at 1310].

In light of the filing deadline for regular-party candidates and in light of the length of time that a third-party or independent candidate has to procure the signature petitions, we do not believe that W. Va. Code 3-5-24, constitutes an unreasonable burden, and therefore it does not violate the Equal Protection Clause of our State or Federal Constitutions.

The prohibition against a voter signing the petition of a third-party or independent candidate and then voting in the regular-party primary is contained in W. Va. Code, 13-5-23(c).[19] It must be remembered that this statute provides the method for ballot access to independent and third-party candidates for the general election in the fall. It thus serves as a primary election bypass for such candidates. In *American Party of Texas v. White,* 415 U.S. 767, 39 L. Ed. 2d 744, 94 S.Ct. 1296 (1974), the Court addressed this problem in the context of a Texas statute which provided that persons who had voted in party primaries were prohibited from signing signature

---

[19] The pertinent part of W. Va. Code, 3-5-23(c), states:

"No person signing such certificate shall vote at any primary election to be held to nominate candidates for office to be voted for at the election to be held next after the date of signing such certificate;"

petitions of third-party and independent candidates following the primary election. In declining to invalidate this provision, the Supreme Court stated:

"Appellants attack this restriction, but, as such, it is nothing more than a prohibition against any elector's casting more than one vote in the process of nominating candidates for a particular office. Electors may vote in only one party primary; and it is not apparent to us why the new or smaller party seeking voter support should be entitled to get signatures of those who have already voted in another nominating primary and have already demonstrated their preference for other candidates for the same office the petitioning party seeks to fill. ..." [415 U.S. at 785, 39 L. Ed. 2d at 762, 94 S.Ct. at 1308].

In confirmation of this point, the *American Party* Court made the following observation in Note 17:

"The parties have not brought to our attention any decision holding that as a constitutional matter, a State is obligated to allow a voter to vote in a party primary and sign a nominating petition. It is true that under the Georgia system in Jenness v Fortson, supra, the State had apparently decided that its legitimate goals would not be compromised by allowing voters to sign a petition even though they have signed others and participated in a party primary. Nothing in that decision, however, can be read to impose upon the States the affirmative duty to allow voters to move freely from one to the other method of nominating candidates for the same public office. This reading becomes all the more evident in light of the fact that Jackson v Ogilvie, 325 F Supp 864 (ND Ill 1971), was affirmed on the same day that Jenness was decided, 403 US 925, 29 L Ed 2d 705, 91 S Ct 2247. Indeed, the federal court decisions with which we are familiar agree with Jackson v Ogilvie and reflect the views we adopt here. See, e.g., Moore v Board of Elections for the District of Columbia, 319 F

Supp 437 (DC 1970); Wood v Putterman, 316 F Supp 646 (Md), aff'd, 400 US 859, 27 L Ed 2d 99, 91 S Ct 104 (1970); Socialist Workers Party v Rockefeller, 314 F Supp 984 (SD NY 1970), aff'd, 400 US 806, 27 L Ed 2d 38, 91 S Ct 65." [415 U.S. at 785, 39 L. Ed. 2d at 762, 94 S. Ct. at 1308].

It is possible to make a practical distinction between third-party and independent candidates on the basis that a third-party might be expected to field at least a partial list of state candidates, whereas the independent presidential candidate stands alone. Yet, we do not believe that this distinction can be elevated to a constitutional principle which would require a state to permit voters to retain a complete franchise in the primary for all candidates except those for whom they had signed signature petitions.

There are several sound reasons why a state may impose a restriction, such as that found in W. Va. Code, 3-5-23, barring a voter from voting in his regular-party primary once he has signed a third-party or independent candidate's petition. First, even regular-party voters are often faced with a primary ballot on which their party has been unable to secure candidates to fill all offices.[20] Thus, to a certain extent, voters who sign a petition for a third-party candidate run the same risk as do voters belonging to a regular party that may not field a complete slate of candidates. However, this fact does not compel the constitutional conclusion that third-party voters should be permitted to retain their right to vote in their regular-party primary.

Second, because third-party and independent signature petitions need not be filed until the day preceding the primary, election officials face the practical problem

---

[20] In West Virginia, this has sometimes occurred in the primary of the Republican Party, which historically has been weaker than the Democratic Party in this State. In the 1980 primary election, the Republican Party did not have a state candidate for either the Office of Attorney General or the West Virginia Supreme Court of Appeals.

of identifying those persons who have signed a signature petition. This would be necessary under a statute that would permit the voter-signer to retain the right to vote for regular-party candidates in the primary election other than the candidates for the same office sought by the candidate whose petition he had signed.

There are, of course, two solutions to the problem. One is to constitutionally require that a state enact no statute prohibiting persons from voting in their regular— party primaries even though they have signed third-party or independent candidates' petitions. However, as we have seen in *Storer* and *American Party of Texas,* the United States Supreme Court has declined to extend this requirement under equal protection principles of the United States Constitution, and we decline to do so under the West Virginia Constitution.

The other alternative is for the State to advance the deadline for filing of the signature petitions to a time sufficiently in advance of the primary election date so that identification of the signatures can be undertaken in regard to candidates for whom the voter will be ineligible to vote in his regular-party primary. Obviously, any such system poses substantial difficulties for election officials, not only in the identification mechanics, but in transmitting this information to election officials in the precinct where the voter resides. Moreover, advancing the filing date works against the interest of third-party and independent candidates, since it reduces the time period in which they can engage in effective signature solicitation for their candidacy petitions. *See McCarthy v. Noel,* 420 F. Supp. 799 (D. R.I. 1976).

For the foregoing reasons, we decline to hold either W. Va. Code, 3-5-24, setting the filing date for signature petitions, or W. Va. Code, 3-5-23(c), prohibiting voters who sign such petitions from voting in their regular-party primary, as setting an unconstitutional burden under the Equal Protection Clauses of the State and Federal Constitutions.

In summary, for the reasons hereinabove stated, and in accordance with this Court's order of May 22, 1980, we find the following portions of this State's election law unconstitutional:

1. The requirement of a filing fee under W. Va. Code, 3-5-8, which is incorporated by reference in W. Va. Code, 3-5-23, insofar as it relates to an impecunious candidate.

2. The provision in W. Va. Code, 3-5-23, which limits nominations to those independent candidates who are members of a third party in lieu of permitting an independent candidate who is not affiliated with any party from being eligible for nomination.

3. The requirement in W. Va. Code, 3-5-23, that a person soliciting signatures on behalf of such candidate must be a resident of the same magisterial district as that in which the voters he solicits reside.

Petitioners' other claims of unconstitutionality as to our election statutes are refused in the following particulars:

1. That portion of W. Va. Code, 3-5-23, which prohibits persons signing a candidate's certificate from voting at the primary election held next after the date of signing such certificate.

2. That portion of W. Va. Code, 3-5-23, which requires persons soliciting signatures to obtain credentials.

3. The provision in W. Va. Code, 3-5-24, which requires the certificates to be filed no later than the day preceding the date on which the primary election is held.

In accordance with the foregoing principles, a moulded writ of mandamus is awarded.

*Writ as moulded*
*awarded.*

McGRAW, JUSTICE, *concurring in part and dissenting in part:*

At the time a pre-election order was entered in this case, I said:

> Justice McGraw would dispose of the case differently, saying first that filing fees are impermissible as a qualification for candidacy under the Constitution of the State. [Qualifications which exceed constitutional mandates are impermissible. *Marra v. Zink,* ____ W.Va. ____, 256 S.E.2d 581 (1979); *State ex rel. Piccirillo v. City of Follansbee,* ____ W.Va. ____, 233 S.E.2d 419 (1977).] Justice McGraw is further of the opinion that the Federal and State Constitutions, in their Equal Protection Clauses, forbid a State election law which operates to confer special privilege or advantage upon any association, candidate or partisan. Every qualified voter is entitled to participate at every step of the electoral process. This right is not restricted to those professing partisan affiliation. The Independent voter has the same constitutional right to cast his ballot for Independent candidates of his choice, in the same election, and upon the same terms and conditions, as does a partisan voter.

> The Election Law, embodied in Chapter 3 of the West Virginia Code, can be applied to enable the Independent voter to participate in the primary election on June 3, 1980. The respondent should be directed to specify ballots in blank for use by the Independent voter at his polling place. The Independent voter could write thereon his vote, which would then be tabulated by the election officials and all candidates receiving the requisite percentage of votes necessary to qualify should be certified to the November general election ballot for consideration by all qualified voters. [1]

---

[1] In the primary election held June 3, 1980, a write-in ballot was provided to all voters in Kanawha County which, if it had been

As I conclude my reflections on this case, keeping in mind the majority's well crafted opinion, I think of article 3, section 230 of the West Virginia Constitution and I wonder why it is such a difficult proposition with which to keep faith.

used throughout the state, would have enabled all persons not affiliated with the two main line parties to participate in the election.